IxAMY, Judge.
This is an insurance subrogation case. Plaintiffs appeal from the trial court’s judgment that the defendants were not liable for a rear-end collision on Highway 347 near St. Martinville, Louisiana. For the reasons which follow, we affirm.
DISCUSSION OF THE RECORD
On November 27, 1990, at approximately 5:40 p.m., Deleambre Batiste, who was employed by St. Martin Sugar Cooperative, Inc., was traveling north on Highway 347 near St. Martinville, Louisiana in a 1969 Chevrolet C-50 dump truck. The truck that Batiste was driving was loaded with sugar cane debris that he was transporting to a dump. At about the same time, Anne Richard, who was operating a 1987 Chevrolet Caprice, was also traveling north on Highway 347. When Batiste approached the road where he planned to make a left turn, he stopped the truck to wait for oncoming traffic to pass. An accident occurred when Anne Richard collided into the back of the truck. Richard sustained serious injuries and died soon after the accident.
|2Richard’s automobile was covered by an insurance policy issued by Allstate Insurance Company. As a result of the accident, Allstate paid its insured, Frank Richard, Anne’s husband, $10,665.55 in collision damage for the complete loss of the car. Also, Frank paid his $500.00 deductible for the loss of the automobile. Allstate additionally paid Anne’s medical and funeral expenses amounting to $2,488.00.
On June 12,1991, Allstate and Frank Richard brought a subrogation suit against Del-eambre Batiste, St. Martin Sugar Cooperative, Inc., and Great American Insurance Company, who had issued a liability insurance policy covering the truck involved in the accident. Allstate and Richard were seeking to recover $13,653.55 from these defendants. Specifically, they alleged that defendants were liable because the truck’s rear lights were not operating at the time of the accident and/or sugar cane debris was hanging from the back of the truck covering the rear lights. Plaintiffs insisted that Anne never saw the truck until it was too late for her to avoid the tragic collision. Defendants answered the suit and denied any liability. Also, defendants contended that the rear-end collision was caused by Anne’s negligence because she failed to see the truck and stop in time. Defendants asserted that the truck’s rear lights were illuminated and that there was no sugar cane debris covering the lights.
A trial on the merits was held on May 31, 1995. The trial court rendered judgment on November 6, 1995 in favor of the defendants and against the plaintiffs. The trial court found that the rear lights on the truck were illuminated and visible at the time of the accident; therefore, Anne Richard was at fault for the collision.
Plaintiffs appeal from that judgment and assert that the trial court erred in: (1) finding that Deleambre Batiste did not breach his duty to secure the load of sugar cane debris and that this breach of duty was not the legal cause of the accident; (2) finding that Deleambre Batiste did not breach his duty to have taillights which emit |aa red light plainly visible for a distance of 1,000.00 feet to the rear and that this breach of duty was not a legal cause of the accident; and (3) failing to award subrogation damages.
LAW
SUGAR CANE DEBRIS AND REAR LIGHTS
In plaintiffs’ assignment of errors 1 and 2, they assert that Anne Richard crashed into the rear of Batiste’s truck because its rear lights were not operating and/or that the lights were covered by sugar cane debris that was hanging out of the back of the truck. We will address these two assignments of error together.
A motorist is under the duty to act as a reasonable and prudent person under like circumstances and is charged with keeping a proper lookout, seeing what should be seen, and observing traffic signs. Jones v. Merritt, 92-748 (La.App. 3 Cir. 3/2/94), 633 So.2d 394, writ denied, 94-1236 (La. 7/1/94), 639 So.2d 1170. A motorist is presumed to have been negligent if he collided with the *750 rear of a proceeding vehicle, and as such, has the burden of exculpating himself from the inference of negligence. Calvet v. Graham, 93-1645 (La.App. 3 Cir. 7/6/94), 639 So.2d 873, writ denied, 94-2098 (La. 11/11/94), 644 So.2d 393. “For the following motorist who collides with a preceding vehicle to exculpate himself, he must show that he kept his vehicle under control, that he closely observed the forward vehicle, that he followed at a safe distance under the circumstances, or that the driver of the lead vehicle negligently created a hazard which the following motorist could not reasonably avoid.” Rudd v. United Services Automobile Assn., 626 So.2d 568, 570 (La.App. 3 Cir.1993).
In the present case, plaintiffs allege that the lead vehicle negligently created a hazard which Anne Richard could not reasonably avoid. Specifically, plaintiffs assert that Batiste failed to (1) secure the load of sugar cane debris in the truck, a violation pof La. R.S. 32:383; and (2) maintain clearly visible illuminated rear lights, a violation of La.R.S. 32:301 and 32:304.
La.R.S. 32:383(B)(1) provides that:
The load on any vehicle shall be securely fastened so as to prevent the covering or load from becoming loose, detached, or in any manner a hazard to other users of the highway.
La.R.S. 32:301, which governs when lighted lamps are required on vehicles, provides:
Every vehicle upon a highway within this state at any time between sunset and sunrise and at any other time when, due to insufficient light or unfavorable atmospheric conditions, persons and vehicles on the highway are not clearly discernible at a distance of 500 feet ahead, shall display lighted lamps and illuminating devices as hereinafter respectively required for different classes of vehicles subject to exception with respect to parked vehicles.
La.R.S. 32:304, which discusses the requirements for tail lamps, states:
(A)Every motor vehicle, trailer, semitrailer and pole-trailer and any other vehicle which is being drawn at the end of a train of vehicles, shall be equipped with at least one tail lamp mounted on the rear, which, when lighted as hereinbefore required in R.S. 32:301, shall emit a red light plainly visible from a distance of one thousand feet to the rear, provided that in the case of a train of vehicles only the tail lamps on the rearmost vehicle need actually be seen from the distance specified. And further, every such above mentioned vehicle, other than a motorcycle or motor driven cycle registered in this state and manufactured or assembled after December 31, 1962, shall be equipped with at least two tail lamps mounted on the rear, on the same level and as widely spaced laterally as practicable, which, when lighted as herein required, shall comply with the provisions of this section.
(B) Every tail lamp upon every vehicle shall be located at a height of not more than 72 inches nor less than 15 inches measured as provided in R.S. 32:302.
(C) Either a tail lamp or a separate lamp shall be so constructed and placed as to illuminate with a white light the rear registration plate and render it clearly legible from a distance of 50 feet to the rear. Any tail lamp or tail lamps, together with any separate lamp for illuminating the rear registration plate, shall be so wired as to be lighted whenever the head lamps or auxiliary driving lamps are lighted.
| sThe following evidence was adduced at trial.
Delcambre Batiste, who was approximately 62 at the time of trial, testified that he had been working at the St. Martin Sugar Cooperative Mill for 47 years. Batiste also testified that he had never been in an accident while driving the truck. Batiste stated that on November 27,1990, he was working at the mill and had been transporting sugar cane debris from the mill to a private dump, about a mile from the mill, located off of Highway 347. He testified that he had already completed two loads when he came back to the mill to complete his last load. He noted that the truck was a short bed truck with a hydraulic dump and that it did not have a *751 tailgate. He farther indicated that the truck was used for dumping trash, such as sugar cane waste and debris.
Batiste testified that he loaded the truck with a front-end loader. He also stated that the sugar debris was wet and muddy. Once the debris was loaded in the truck, Batiste stated that he pressed down on it with the front-end loader so that it would not move while it was being transported. At that point, Batiste stated that he cut any cane debris hanging from the truck with a “briar hook.” He specifically stated that he would “clear the taillights.” After the debris was loaded and then cut, Batiste testified that he then turned the lights on in the truck and walked back to check if the rear lights were operating. He stated that the front and rear lights were operating.
Batiste testified that he then got into the truck and began to operate it along the driveway from the mill to Highway 347. When he reached Highway 347, Batiste indicated that he turned left, and began to travel north. While he was on the highway, Batiste stated that a “lot” of automobiles following him from behind passed him up. He then testified that as he approached the road where he needed to turn left, he put his left signal light on and applied his brakes. He stated that the truck came to a |6complete stop because there were oncoming cars in the south bound lane of Highway 347.
When Batiste was asked to describe the accident, the following colloquy took place:
A. Well, I was waiting until the truck passed. The truck passed with Mr. Clint Lasseigne, he passed me up first, and I still have to wait until the other car can pass, and at the main time when Mr. Clint passed, they have that car coming, she was coming in the back. I looked at that mirror and I saw she was coming, and I turned back forward. When that car was almost to me, that’s when I heard her hit me. I said, oh my God, that lady done run into me, or whatever it was. So I got down and I went to the car, the door was locked. So I, the lady was passing, the car I’m talking about was suppose to pass me up, I asked them to go call for help.
Q. When Mrs. Richard struck the back of your truck, did that move your truck?
A. It pushed it forward.
Q. Okay. Well, what did it do to the load in your truck?
A. It pushed the load on the hood of her car.
Q. So what we’re looking at then, in the picture which is # 4 and # 13 of the load hanging over the back end of your truck, that’s what happened as a result of her hitting your truck, is that right?
A. That’s correct.
Q. That’s not the way your truck left—
A. No, sir.
Rufus Batiste, Jr., who was an employee at the sugar mill, testified that he was working at the mill when Batiste loaded his truck for the final haul to the dump. Rufus stated that after Batiste had loaded the track, he then “caught his briar hook and cut all the way around the truck.” When Batiste drove away in the truck, Rufus testified that “he had lights” and he noted that he also saw the lights on the truck’s ^license plate. Rufus did admit that there were a “few” cane stalks hanging down off the back of the truck when Batiste left the mill.
Lawrence Levert, a member of the St. Martin Sugar Cooperative, testified that he saw Batiste leaving the mill and heading north on Highway 347. Levert stated that the truck’s rear lights were on at that point. Levert was then handed plaintiffs’ exhibit #8, photograph #4, which depicted cane hanging out of the truck and onto Richard’s vehicle at the accident site. Levert stated that the cane was not in that condition when he saw Batiste turn onto Highway 347.
Robert Albert, a sugar cane farmer, testified that he was at the mill at approximately 5:30 p.m. when he saw Batiste leaving the mill. Albert stated that he followed Batiste’s truck down the mill’s driveway towards Highway 347. When asked if he saw the lights on the truck, the following exchange took place:
*752 Q. All right. As his truck passed in front of you — I’m going to show you these photographs, Plaintiffs Exhibit #8, photographs # 14, # 13, # 4 and # 11, and you see how the cane is hanging over the back end of the truck?
A. Yes, sir.
Q. Was the cane hanging over the back end of the truck when he passed you before the accident?
A. It might have had one or two canes hanging but not like that.
Q. Okay. One or two stalks of sugarcane hanging over, but nothing like what’s shown in these photographs?
A. No, sir.
Q. Could you see his taillights as he passed you before the accident?
A. When he got to the black top, he put on the brakes and I saw his brake lights.
Q. Were they on?
A. Yes, sir.
|8Q. You could see lights?
A. I saw his brake lights. And when he put them off, I was still looking at the truck and I seen his taillights.
Q. And they were still on?
A. Yes, sir.
Phillip Berard testified that he was traveling north on Highway 347 when he approached the rear of Batiste’s truck. Berard indicated that, at the time, the sun had set. He further testified that he could not see any lights from the rear of the truck and that there was some sugar cane debris hanging from the truck. He admitted that he could make out the truck from the silhouette of oncoming traffic in the south bound lane. Berard indicated that he then passed the truck approximately % of a mile from the accident site.
On cross-examination, Berard stated that earlier that evening, as a safety precaution, he had followed some cane carts to the mill that didn’t have any lights. But, Berard stated that he did not follow Batiste’s truck. Also, he acknowledged that he was a cousin to Ned Berard, whose children where plaintiffs in a consolidated suit that was related to this litigation. Finally, he admitted that he was a neighbor of the Richards.
Carol Berard, Phillip’s wife, testified that she was a passenger in her husband’s truck that night. She stated that when they approached Batiste’s truck, she could not see the rear lights on the truck because there was sugar cane debris hanging out of the back. She also corroborated her husband’s testimony that they passed the truck about ⅜ of a mile from the accident site.
Clint Lasseigne, a sugar cane farmer and member of the St. Martin Sugar Cooperative, testified that he was traveling south on Highway 347 and that he crossed Batiste’s truck about 100 yards from the accident site. Lasseigne stated that he saw lathe truck’s headlights. He also testified that after he crossed the truck, he looked into his rearview mirror and saw the truck’s rear lights. Lasseigne also noted that he did not see any overhanging cane in the truck. He explained that it was a “habit” to check the back of sugar cane carts to observe if the lights are properly working.
Michael Labiche, a road trooper with the Louisiana State Police who investigates traffic accidents, testified that the accident occurred at approximately 5:40 p.m. Trooper Labiche described Highway 347 where the accident happened as an undivided, two lane, straight road in a rural area with no lighting. Further, he noted that the speed limit was 55 m.p.h. He stated that when he arrived at the accident scene, Anne’s vehicle’s front hood was underneath the back of the truck. Trooper Labiche stated that there was sugar cane debris hanging out of the back of the truck. He also stated that the truck had been moved to some extent as a result of the collision. Trooper Labiche testified that Anne was seriously injured and that he never had the opportunity to talk to her. Finally, he stated that he did not know if the rear lights on the truck were functioning at the time of the collision.
Richard Williams, a traffic homicide investigator for the Louisiana State Police, testified that he arrived at the accident scene at about 6:51 p.m. In his accident report, which was introduced into evidence, Williams noted that Highway 347 was in “good condition” *753 and that the weather was warm, windy, with no precipitation prior to the accident. Williams testified that there was approximately 37 feet of skid marks from Anne’s vehicle immediately preceding the collision. He opined that Anne was traveling at a minimum of 55 m.p.h. and a maximum of 63 m.p.h. when she first began to apply her brakes. As a result of the collision, Williams stated that the vehicles moved 11 feet, 6 inches after impact.
| ipWilliams testified that he removed the rear fights on the truck for testing because this was a “rear-end collision at nighttime.” He noted that the bulb and filaments were cracked and broken. He further stated that the rear fight switch in the truck was on when he checked it after removing the fights. He testified that no citations were issued because no alcohol was involved and there was no “substantial negligence” on the part of Batiste. But, Williams stated that he thought the truck was overloaded; however, he acknowledged that the Department of Transportation and Development weighed the truck with portable scales and informed him that the truck was “well within the limit.” Finally, he testified that when Anne’s vehicle was removed from the back of the truck, there was some sugar cane embedded into the truck’s rear light assembly. As such, he opined, the sugar cane must have been hanging in the front of the rear fights prior to the collision.
Patrick Lane, a forensic scientist at the Louisiana State Police Crime Laboratory, testified that he examined the rear fights to determine whether or not they were illuminated at the time of the collision. Lane explained that a rear fight is composed of an exterior glass bulb. He then stated that inside this glass bulb are two pair of metal posts that are connected to the base of the bulb. He noted between each pair of metal posts is a tungsten filament coil which burns when an electric current runs through it. Lane testified that there are two pair of metal posts, each with a tungsten filament, that operates the rear fights and rear turning signals. Lane stated that as long as the tungsten filaments are burning within the glass bulb, they reach a high enough temperature to glow. He noted that the filaments will continue to glow as long as electricity passes through the filament and no oxygen leaks into the glass bulb.
InLane testified that if the glass bulb breaks, and oxygen gets in, the tungsten filament burns rapidly and produces a white tungsten oxidation product that will be deposited on the support posts and on any filament that is left. Lane then noted that, if the rear fights were operating at the time of the collision, he would be able to detect this white tungsten smoke product on the metal support posts.
Lane testified that when he examined the truck’s rear fights, there was no glass bulb, and no tungsten filament coil. He stated that the only thing remaining on the fights were the support posts and some filament pieces. After his examination, Lane testified that he could not see any blackening or tinting on the remaining pieces of tungsten filament coil that were deposited on the support posts. He also stated that he did not see any white tungsten oxide on any of the posts. He further observed that the remaining tungsten filament had jagged edges which revealed a “cold fracture.” As such, Lane opined that the rear fights on the truck were not operating at the time of the accident.
Jimmy Barnhill, the Laboratory System Technical Manager at the North Louisiana Crime Laboratory, testified that he examined the two rear fights on February 25, 1992. He reiterated that the glass was completely broken and the only thing he could see was the support posts and some pieces of the tungsten filament coil. He noted the support posts were “bent and misshapen quite a bit.” He testified that the support posts were “shiny” with no white tungsten smoke deposits. He farther testified that the tungsten filament pieces had “cold fractures.” He explained that, if tungsten breaks at room temperature, it breaks leaving a jagged edge which is called a “cold fracture.” Finally, Barnhill testified that he agreed with Patrick Lane that the two rear lamps exhibited no evidence of being illuminated at the time of the accident.
*754 | i2Eric Jackson, an electrical power systems designer and forensic investigator, testified that he examined the rear lamps on February 17, 1992. After he looked at the lamps, he stated:
Given the information that I have if asked to express an opinion I couldn’t find anything to give me an indication that I felt like they were on. Again the classic symptoms of — and I’m sure you’re going to ask me some more questions. But the pieces of the filaments left were not blackened as though they burned out from exposure to air. And that’s going to be shown in other photographs.
The fractures themselves appear to be more angular, the breaking, the severance of the filament itself appeared to be more angular rather than round and beaded that one would expect if it was glowing red hot when it broke. So I didn’t find the symptoms that normally are associated with an incandescent bulb at the time of breakage.
James Lock, the owner of Collision Research Associates, testified on behalf of the defendants. Lock noted that he specializes in traffic accident investigation and reconstruction. Lock stated that he examined the two rear lamps on July 9, 1992. He testified that there was tissue paper wrapped around the filament support posts and onto the base of the lamp. When asked why the tissue presented a problem, Lock replied:
Well, it’s an accepted practice not to contact the filament support posts or the filaments with any material if that filament support post or filament is going to be used for any kind of evidence evaluation. That is a standard evidence-handling procedure. It’s one that’s well outlined in this Northwestern Traffic Institute book. There’s a specific section that says you should not wrap the bulbs in tissue, and it was just a very poor evidence-handling technique that tends to degrade the condition of the bulbs from their condition and changes the condition of the bulbs.
Lock testified that the main problem is that anytime the tissue rubs on the support posts and filament pieces, it is going to clean these pieces and destroy evidence that was deposited there.
Lock testified that once the glass bulb is broken and oxygen strikes the tungsten filament, it will take about two to five seconds for the tungsten filament to | igburn and produce oxide smoke. Lock then opined that there was not enough evidence “to say conclusively that these lights were either on or off.” Lock then explained his reasons:
If Mr. Lane would have read the Northwestern book, he would see that, on page 23-20, there is a paragraph in here that talks about what happens when the filament breaks and it’s incandescent, whatever breaks the glass continues on, tears through the filament from both supports, and the filament’s lost. “Close to the support, the filament is cold enough to fracture. Oxidation is minimum there, and not enough filament is left to show what little there might be. Thus, without reliable indications of filament temperature, whether the filament was incandescent or not is, in this case, indeterminate.”
[[Image here]]
Now what we have in this case is a situation where we have this glass bulb sitting out here exposed to this vehicle that comes into the back of the truck. This vehicle is traveling at the state police estimates of 55 to 63 miles per hour. Okay?
If we look at some very simple numbers which I have here, for example, at 50 miles per hour, the vehicle’s traveling at 879 inches per second. The upper filament is about .25 inches from the top of the glass bulb to the upper filament of the bulb. The lower filament, which would [sic] the break light or turn signal, is about .31 inches from the top of the bulb to the filament, and that’s on a GE 1157 bulb.
So, if you have the vehicle that impact the rear of that truck at 50 miles per hour — and that’s lower than the state police estimates- — the time it takes from the time the glass is fractured until the car rips through and destroys that filament and bends those support posts the way they’re bent is going to be three ten-thousandths of a second.
In three ten-thousandths of a second, you’re not going to get oxidation of the *755 tungsten filament in sufficient quantities to liberate tungsten oxide and to coat support posts or to change colors. It’s just not going to happen.
All these studies that are referenced in Baker, Northwestern, these other publications, the ones that these guys are using, talk about support posts and tungsten filaments that are allowed to expire on their own in that two to five seconds, or that they’re exposed for a second or so.
They don’t talk about a situation, except on that paragraph that I just read into the record, where the bulb is just basically hammered, where it — in three ten-thousandths of a second, you break the bulb and the filament. You don’t get physical evidence of tungsten oxide.
|14After hearing all this evidence, the trial court noted that it was “most impressed with the witnesses who saw the fights and saw that they were visible and illuminated prior to the accident.” Further, the trial court found that the scientific testing did not convince the court that the bulbs were not illuminated. Specifically, the trial court stated that it was “impressed by the deposition of Mr. James Lock.”
The trial court was faced with conflicting testimony as to whether the rear fights on the truck were illuminated and visible at the time of the accident. The trial court chose to believe the defendants’ witnesses. In Stobart v. State Through DOTD, 617 So.2d 880, 882-883 (La.1993), the Louisiana supreme court thoroughly explained the appellate standard of review:
A court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” Rosell v. ESCO, 549 So.2d 840 (La.1989). This court has announced a two-part test for the reversal of a factfinder’s determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
See Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).
This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court’s finding. Id. The reviewing court must review the record in its entirety to determine whether the trial court’s finding was clearly wrong or manifestly erroneous.
Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. See generally, Cosse v. Allen-Bradley Co., 601 So.2d 1349, 1351 (La.1992); Housley v. Cerise, 579 So.2d 973 (La.1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Even though an appellate court may feel that its own evaluations and inferences are more reasonable than the factfinder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the 1 istestimony. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). However, where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness’s story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell, 549 So.2d at 844-45. Nonetheless, this Court has emphasized that “the reviewing court must always keep in mind that ‘if the trial court or jury’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.’” Housley v. Cerise, 579 So.2d 973 (La.1991) (quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990)).
This court has recognized that “[t]he reason for this well-settled principle of re *756 view is based not only upon the trial court’s better capacity to evaluate live witnesses (as compared with the appellate court’s access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.” Canter v. Koehring Co., 283 So.2d 716 (La.1973). Thus, where two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Id.
As previously stated, plaintiffs had the burden of exculpating Anne Richard from the inference of negligence. After a review of the record, we cannot conclude that the defendants’ witnesses’ stories were so internally inconsistent or implausible. We find that it was reasonable for the trial court to conclude that Batiste had the rear lights on; that the rear lights were illuminated and visible; that when Anne Richard struck the back of the truck, the load of sugar cane debris shifted to the back of the truck and onto the hood of Anne’s vehicle; and that the rear-lights were destroyed at such a significant speed, scientific testing would be inconclusive as to whether the rear lights were illuminated at the time of the accident. Thus, we conclude that the trial court was not manifestly erroneous in finding that the rear lights on Batiste’s truck were illuminated and visible at the time of the accident and that Anne Richard was at fault for the rear-end collision.
_[i6ÜECREE
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed against the plaintiffs.
AFFIRMED.