11 KNOLL, Judge.
In this automobile collision case, a jury found the plaintiff, Tereal Calvet, 20% at fault. Mr. Calvet appeals this finding and seeks an increase in the quantum awarded.
*875 FACTS
On May 21, 1990, Tereal Calvet was driving his Ford van east on Masonic Drive, a 4 lane street in Alexandria, Louisiana. As Mr. Calvet was traveling in the left east bound lane, he approached two vehicles in his lane waiting to make left turns off of Masonic Drive. Mr. Calvet testified he slowed to a stop approximately two car lengths behind the turning vehicles. Mr. Calvet believed he had been stationary for several seconds when his van was struck from behind by the vehicle of the defendant, William Graham.[1] Mr. Calvet testified the impact was severe enough to force the driver’s seat in the reclining position and propel his van into the car in front of him. However, Patricia Graham, Mr. Graham’s wife and passenger at the time of the accident, testified that Mr. Calvet braked abruptly and actually struck the vehicle in front of him before the Grahams’ vehicle collided with the van. Apparently none of the vehicle occupants required an ambulance and Mr. Calvet washable to exit his van under his own power. Mr. Cal-vet was later taken to a nearby hospital by his wife and daughter, who had been called to the accident scene. Mr. Calvet was x-rayed at the hospital, and as the x-rays showed nothing conclusive, he was released a few hours later.
After trial of the matter, a jury found Mr. Graham 80% at fault, Mr. Calvet 20% at fault, and awarded Mr. Calvet $9000.00 total damages and Mrs. Calvet $1000.00 for loss of consortium. Mr. Calvet made a motion for judgment not withstanding the verdict or in the alternatives, a new trial or additur. The trial court denied this motion.
On appeal, Mr. Calvet first argues the jury was clearly wrong in assigning any fault to him and in awarding only $9000.[2] He also alleges the trial court erred in not granting his post-trial motions. Finally, Mr. Calvet points to several actions by the trial court, contending these were so prejudicial as to be reversible error. For the reasons that follow, we find the jury was clearly wrong in assigning fault-to Mr. Calvet, but otherwise we uphold the actions of the jury and trial court.
PLAINTIFF’S FAULT
In Eaglin v. Champion Ins. Co., 558 So.2d 284, 287 (La.App. 3 Cir.1990), this court noted:
“It is a matter of hornbook law that a motorist is presumed to have been negligent if he collides with the rear end of a vehicle preceding his vehicle and has the burden of exculpating himself from the inference of negligence.”
Therefore, if the defendant seeks to exculpate himself by demonstrating fault on Mr. Calvet’s part, the defendant clearly carries the burden of doing so. With this in mind, we review the evidence the jury could have relied upon in finding Mr. Calvet 20% at fault.
The only witnesses testifying as to the cause of the accident were Mr. Calvet and Mrs. Graham, who were actually in the accident Rand Alexandria Police Officer Ronnie Howard, who investigated the accident. Mrs. Graham testified that Mr. Calvet abruptly applied his brakes, making it impossible for Mr. Graham to stop before hitting the van. Mrs. Graham remembered hearing squealing brakes that did not come from her vehicle, prior to seeing the van come to a sudden stop. She also testified that she believed the brake lights on the van were not working because she was looking ahead at the van just prior to the accident and saw no brake lights. This is in direct conflict with Mr. Calvet’s testimony maintaining he had gradually slowed to a complete stop several seconds before being struck by the Graham vehicle. More importantly, however, the testimony of Officer Howard contradicts Mrs. Graham. Officer Howard testified that he and another police officer checked Mr. Cal-vet’s brake lights after the accident and *876 found them to be still functioning. Furthermore, Officer Howard stated there were no skid marks produced by Mr. Calvet’s van.
We are ever mindful that where a factfinder’s finding is based on its decision to credit the testimony of one of two witnesses, that decision can virtually never be clearly wrong. Rosell v. ESCO 549 So.2d 840 (La.1989). However, this is not the case where objective evidence so contradicts the witness’s story that a reasonable trier of fact would not credit the witness’s story. Rosell, supra. If the evidence consisted only of the conflicting testimony of Mr. Calvet and Mrs. Graham, we would have no doubt that Mrs. Graham could have carried her burden of proof simply by her superior credibility in the eyes of the jury. However, where the only physical evidence directly contradicts Mrs. Graham’s testimony, we are not dealing with the same issue. Not only were Mr. Calvet’s brake lights operating after the accident, but it is unlikely Mr. Calvet’s brakes were “squealing” and at the same time left no trace of skid marks.
It is well settled that the test of the sufficiency of the evidence in a civil case, whether direct or circumstantial, is whether the evidence, taken as a whole, shows the fact sought to be proved is more probable than not. Merrell v. State, Through Dept. of Transp., 415 So.2d 660, 663 (La.App. 3 Cir.1982), writ denied 420 So.2d 443 (La.1982).
Uln view of the objective evidence contradicting Mrs. Graham’s version of the accident, the jury could not reasonably conclude that she proved more probably than not any fault by Mr. Calvet. For this reason, we find the jury was clearly wrong in assigning any percentage of fault to Mr. Calvet.
QUANTUM
Mr. Calvet also complains the jury clearly erred when it awarded him only $9,000 in total damages. Dr. John Patton, a neurologist and Mr. Calvet’s treating physician, was the only medical expert to testify at trial. A rather extensive review of Dr. Patton’s testimony is necessary to put the medical evidence in proper perspective.
Mr. Calvet first came under Dr. Patton’s care in May of 1988. Mr. Calvet was experiencing severe pain in his back, radiating into both legs. A CT scan revealed Mr. Calvet suffered from severe lumbar spinal stenosis. Dr. Patton described this as a narrowing of the spinal canal which tends to compress the spinal cord. The stenosis was caused, at least in part (to what degree Dr. Patton could not opine), by a condition known as acromegaly. Dr. Patton explained this condition is caused by an overproduction of growth hormone by the pituitary gland. As result of acromegaly, an afflicted individual’s joints and extremities and soft tissue get much , larger than normal. In Mr. Calvet’s case, the growth of the bone and tissue forming the spinal canal resulted in stenosis.
To relieve the stenosis, Dr. Patton performed a laminectomy on the LI to L5 region in May of 1988. After September of 1988, Dr. Patton felt Mr. Calvet had recovered sufficiently that no further office visits were schedule.
Mr. Calvet next saw Dr. Patton on June 6, 1990, complaining of general neck and back pain and particularly of pain radiating into his legs. Mr. Calvet associated the onset of these symptoms to the May 21, 1990, accident with the Grahams. Dr. Patton treated Mr. Calvet conservatively with only pain medication and saw him again on July 13, 1990. After the July 13, 1990, office visit, Dr. Patton did not see Mr. Calvet again until January of 1991. At this Intime a CT scan of Mr. Calvet’s spine indicated some narrowing of the neuroforamen[3] on the right side at the L5 SI level. Dr. Patton believed this explained at least part of the pain in Mr. Cal-vet’s right leg. A MRI was also perform on Mr. Calvet’s thoracic spine area. It indicated significant stenosis at the T10-11 and Tll-12 levels. This was analogous to the stenosis Mr. Calvet had suffered from in the lumbar spine region. As Dr. Patton explained, “same condition except it’s higher up *877 [the spine]”. When Dr. Patton next saw Mr. Calvet on January 30, 1991, the pain in his legs had increased to the point where Mr. Calvet could not walk 50 feet without sitting down. Dr. Patton said this was typical of spinal stenosis and he wanted to perform a thoracic myelogram in order to obtain a clearer picture of the problem. However, Mr. Calvet was reluctant to undergo the myelogram, which Dr. Patton related could be rather painful, and instead chose to rely on continued pain medication.
Dr. Patton did not see Mr. Calvet again until July of 1992. At that time Mr. Calvet was admitted to the emergency room complaining of severe pain. At this point, Mr. Calvet submitted to a myelogram. After the myelogram, Dr. Patton was optimistic that further surgery could be avoided. The mye-logram indicated multiple levels of degenerative disease (arthritis) in his back and mild nerve compression, but no definite nerve root compression or spinal cord compression necessitating an operation. Mr. Calvet was eventually discharged and prescribed stronger narcotics to control his pain. When Dr. Patton next saw Mr. Calvet on September 4, 1992, he opined Mr. Calvet was improving, but noted that Mr. Calvet was using a walker at the time. The last time Dr. Patton saw Mr. Calvet before trial was January 27,1993. At this time Mr. Calvet was still experiencing weakness in his legs and a decreased ability to experience pin pricks on his legs. Speaking in reference to this point in time, Dr. Patton candidly testified he could not be sure what was causing Mr. Calvet’s problems. Dr. Patton’s Intestimony on direct exam is well characterized by the following passage:
Q: You don’t know exactly what’s causing it. You think his problem is multifactorial.
A: Yes.
Q: Is that a good word?
A: Yes.
Q: Alright. And that’s ... the multifac-tors, in Mr. Calvet’s problem is the acromegaly?
A: Yes.
Q: The stenosis and arthritis?
A: Yes.
Q: And the accident of May 21, 1990?
A: Yes.
Q: As a matter of fact, Dr. Patton, you think it’s possible that there’s been an aggravation of that stenosis by the accident, correct?
A: Stenosis is the actual physical narrowing by the overgrown bone. And I think that the stenosis probably was not aggravated by the accident. That is to say the bone didn’t get more overgrown as a result, but he was in a very tenuous position prior to the accident. Any little trauma on a spinal canal or nerves which are already so tightly pinched can cause him to become very symptomatic. And that’s what I think happened.
On cross-examination, defense counsel further highlighted the difficulty of connecting Mr. Calvet’s injuries with the accident as opposed to his pre-existing medical condition. Dr. Patton admitted acromegaly can be characterized by progressive muscular weakness. It was also emphasized that even during the post accident office visits in June and July of 1990, the leg weakness Mr. Calvet had complained of in 1988 was not present; thus indicating that he was progressively improving since the 1988 laminectomy. When asked why Mr. Calvet’s problems had worsened by the January 1991 visit, 7 or 8 months after the accident, but these problems were not present in June or July of 1990, just after the accident, Dr. Patton testified that he had no idea. Dr. Patton indicated there need not be a particular event to cause the symptoms to occur. “They could just come up.”
On appeal, Mr. Calvet complains the jury’s award of $8000 in general damages and $1000 in medical expenses was grossly ^inadequate. In addition to citing cases in which considerably larger general damages were awarded, Mr. Calvet points out that the parties stipulated that Mr. Calvet had incurred approximately $14,600 in medical expenses since the accident. If there was no issue as to causation of his injury and pain, we would be inclined to agree that the jury abused its discretion. However, while a plaintiff is entitled to compensation for the full extent of any aggravation of a preexisting injury, a causal link between the defen *878 dant’s acts and the degree of aggravation must be established. Cash v. Charter Marketing Co., 607 So.2d 1036, 1039 (La.App. 3 Cir.1992). Therefore, if the jury could reasonably find the accident only mildly aggravated Mr. Calvet’s preexisting condition, then it would be improper for this court to disturb the jury’s award.
Reviewing Dr. Patton’s testimony, it seems Dr. Patton believed the accident probably played some role in Mr. Calvet’s medical problems. However, Dr. Patton clearly could not quantify to what degree Mr. Cal-vet’s problems were related to the accident as opposed to preexisting conditions. Additionally, Dr. Patton’s testimony indicates Mr. Calvet apparently experienced alternating periods of improved health and reoccurring pain, which were not obviously associated with the time of the accident. Finally, the jury may have been influenced by the defendant’s efforts to show Mr. Calvet was exaggerating his disability. Mr. Calvet testified that he almost never walked without a cane and that it was very difficult for him to bend over without his cane. During trial, the defense presented a surveillance video of Mr. Calvet and the testimony of the investigator who took the video. While the video showed Mr. Calvet walking with his cane part of the time, it also showed him entering a convenience store without his cane and exiting with three soft drinks in his hands for the passengers of his vehicle. The investigator also testified seeing Mr. Calvet bending over without his cane picking up litter in the parking lot of Mr. Calvet’s business.
In view of the evidence presented at trial, the jury ^apparently believed either Mr. Calvet was exaggerating his symptoms or, more likely, that the symptoms were causally more related to his preexisting condition rather than the automobile accident with the Grahams. Under these circumstances, we believe the jury was within its discretion in awarding $8000 in general damages and $1000 in medical expenses. Not only is the trier of fact’s discretion “vast” when awarding general damages, Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), but similar findings are not unprecedented in this circuit where causation is seriously disputed. See Cash, supra., where the plaintiff alleged a slip and fall aggravated a preexisting injury. The appellate court upheld the jury’s finding of $5,000 in general damages and $5,000 in medical expense, even though the plaintiff indicated he had expended $36,500 in medical costs. See also, Washington v. Bellard, 602 So.2d 223 (La.App. 3 Cir.1992). Considering the uncertain nature of the medical evidence, we cannot say the jury was clearly wrong.
ALLEGED PREJUDICIAL CONDUCT OF TRIAL
In his final assignment of error, plaintiffs counsel points to several instances that he contends created a pervasive “anti-plaintiff’ atmosphere and denied Mr. Calvet a fair trial. For the reasons that follow, we find the plaintiffs arguments to be without merit. Statements of prospective jurors.
Plaintiffs counsel first contends he was prejudiced by the statements of certain prospective jurors during voir dire. At the outset, we note the record does not contain the transcript of the jury voir dire, and we must rely on the plaintiffs brief for the factual background. However, even relying on the plaintiffs version of events, we find no prejudice.
Apparently, at some point during,jury selection, a prospective juror volunteered his opinion that any meritorious claim against an insurance company for hundreds of thousands of dollars would be settled by the insurance company. This individual did not serve on the jury. In Palmer v. Goudchaux/Maison Blanche, 588 So.2d 737 (La.App. 5 Cir.1991), writ denied, 590 So.2d 1186 (La.1992), a prospective juror implied the defendant had treated her brother-in-law unfairly in the past. Although the prospective juror was dismissed, the defendant still moved for a mistrial. Our brethren on the Fifth Circuit upheld the trial court’s denial of the motion, finding the defendant had not been unduly prejudiced. Similarly, in the case sub judice, the plaintiff has shown no actual prejudice.
The plaintiff also complains when his counsel asked if any prospective juror be *879 lieved accident litigation resulted in higher insurance costs for themselves, a majority responded affirmatively. In brief, the plaintiff states he originally believed this sentiment could be dealt with through challenges and the presentation of his case. However, the plaintiff now contends that this, in combination with other incidents detailed below, denied him a fair trial. First, the plaintiff has not indicated that he asked any prospective jurors if their concern over insurance costs would affect their ability to fairly judge his case. Secondly, the plaintiff points to no specific example of the trial court wrongly denying his challenge of a juror for cause. We find it very difficult to entertain the plaintiffs allegations of an impartial jury when the record does not show a single juror was selected over his challenge of that juror. The record before us does not support the plaintiffs contentions of an impartial jury.

Application for Supervisory Writs

The plaintiff next contends he was prejudiced by the trial court’s explanation, to the jury that the trial would be delayed the rest of the day while plaintiff sought supervisory review of a trial court ruling. The incident complained of occurred on the second day of trial. On the first day of trial, after the jury was selected, but before opening arguments, the defendant complained it was unfairly surprised by the plaintiffs decision to have his medical expert witness appear in person as opposed to by video deposition. The trial court released the jury for the remainder of the day in order to allow the defendant a chance to- revise his [ ^opening statement. The following day, before the jury was brought into the courtroom, a dispute arose as to what damages the plaintiff could properly try to prove at trial. After lengthy argument on the issue, the trial court ruled against the plaintiff. The plaintiff then asked for a stay in the proceedings for several days to allow him to take supervisory writs. The trial court, considering the jury had been empaneled, refused to stay the proceedings beyond the remainder of that day. Plaintiffs counsel indicated this would be sufficient time to take writs. The jury was then brought in and the trial court explained that the jury was going to be dismissed until the next morning. During this explanation, the trial court made reference to the fact that it was the plaintiff applying for supervisory review. After the jury was dismissed, plaintiffs counsel moved for a mistrial, asserting the jury would “attribute the delay to the plaintiffs’ audacity to challenge a ruling of the court”, and therefore be prejudiced against him. The motion was denied.
In reviewing the trial court’s actions, it is necessary to reproduce the trial court’s explanation to the jury in its entirety, so that it may be put in the proper context.
“Ladies and gentlemen of the jury, this never happens on TV. You know that we are missing a juror and no one seems to know why. This is the juror that said she had an examination. I did provide her some information with, you know, advice to her professor as to what was going on and that I expected she would be able to make up the exam but that may not have been the case. We simply haven’t heard so we do not know what has happened to that juror. Our first recourse is simply to at this time select an alternate to move forward and become a regular juror. However, we have another problem. The attorneys have raised a legal issue, a legal question concerning the presentation of evidence. I have made a ruling that would substantially affect the presentation of the case and the attorneys are going to seek a writ review to the Court of Appeals to determine whether or not my ruling is correct. It will so affect the outcome of the case as to whether or not this information ... this ... this evidence is available to you that I have concluded that I should stay this trial for the balance of the day to give the Plaintiff the attorn ... the opportunity to question my ruling. So, in effect, what I’m going to do is stay these proceedings until 9:30 in the morning. We may find our juror in the meantime but what it' means is I’m gonna | ulet you go home for today but you gotta come back tomorrow. I think this is a significant issue for the parties and if we can get a ruling from the Court of Appeals we should do so because it may affect what we have to do for the next two days.”
*880 In view of this passage, we believe the plaintiffs claims of potential prejudice are greatly exaggerated. First, the trial court based the delay as much on the missing juror as on the supervisory writs. Secondly, while referring the plaintiff once, the trial court several times made reference to the more neutral “the attorneys”. Finally, the trial court did not express disapproval of the delay, but indicated that it was the necessary and proper course of action. “I think this is a significant issue for the parties and if we can get a ruling from the Court of Appeals we should do so ... ”. While it may have been preferable to have neither party specifically identified as the one applying for writs, the overall tenor of the trial court’s explanation was clearly neutral and even-handed. We do not find the plaintiff was prejudiced in this manner.

Insufficient time to deliberate

The plaintiff contends the trial court pressured the jury into rendering a verdict without sufficient time to deliberate.' After the presentation of evidence ended on Friday afternoon, the trial court gave the jury its choice of continuing the trial on Saturday or finishing that evening. The jury choose to finish that evening. In addition to this, the plaintiff argues the trial court improperly pressured the jury by “threatening to feed them jail food.”
First, we note the trial court has great discretion in directing the proceedings before it. The trial court does not err by simply trying to accommodate the jury. In Jackson v. Ed’s Cab Company, 333 So.2d 701 (La.App. 4 Cir.1976), writ denied, 337 So.2d 877 (La.1976), the Fourth Circuit found it proper for the trial court to give the jury the choice between finishing the trial that night or continuing in the morning. Secondly, we find the plaintiffs assertion that the trial court “threatened” the jury with jail food to be a gross misrepresentation of the record. At |i2the close of the presentation of evidence, the trial court stated in the presence of the jury:
“Alright then. This finishes the presentation of the evidence, ladies and gentlemen. What I’m going to do is give the attorneys a brief rest and I am gonna go ahead and proceed, gentlemen, considering the jury’s commitments for tomorrow. And we’ve been able to ascertain that we can at least obtain some sustenance from'the jail so that the jury can feel free to stay as long as they want in session.”
After the jury left the courtroom, the court responded to plaintiff counsel’s request that the jury be required to return the following day, Saturday.
Well, the Court feels that and I know it’s a late hour but people had commitments. I simply asked if they had commitments. Four of the jurors showed that they had commitments for tomorrow which would have had to be broken and, therefore, the Court determined since ... we can easily get a sandwich tray for the jury from the jail, that there would be no sense in coming back tomorrow since I can make them comfortable and give them all evening to deliberate ...”
Rather than threatening the jury, we find the record demonstrates that the trial court was doing everything in its power to accommodate the jurors and make them more comfortable. The record shows that the trial court acted not only correctly, but admirably in protecting the interest of the jurors and litigants. This was a heated trial, with each lawyer aggressively representing his client. We find the plaintiffs entire allegation that the trial court’s conduct was less than impartial utterly without merit. Despite the argumentative exchanges between the lawyers, often accusing each other of improprieties, the trial court conducted itself in a patient, fair, even-handed and exemplary manner.

Conduct of defense counsel.

In brief, the plaintiff points out two instances where he alleges the conduct of the defense counsel prejudiced him. The first concerned what the plaintiff describes as “a calculated and successful attempt to portray plaintiffs’ counsel as inept”. When the plaintiffs accountant began testifying, the defendant objected to his using certain business records not yet placed in evidence. After lengthy argument, the trial court required the plaintiff to | ^return to the stand and verify the records. As the plaintiff portrays *881 it, the jury saw the accounting expert take the stand and visual aids being set up. Then defense counsel made an objection and the jury left the room. On returning to the courtroom, the jury saw the visual aids being taken down so Mr. Calvet could return to the stand and authenticate the business records. According to the plaintiff, these sequence of events caused him substantial prejudice. We cannot agree. In the course of a normal trial, the jury may be required to leave the court room innumerable times while the parties argue objections. Many times, if not most of the time, it will be apparent who prevailed on the ruling. It is simply the nature of jury trials. Unless the party complaining can show some specific manner in which he or she was prejudiced, we have no basis for interfering with the trial process. We find no merit to plaintiffs argument.
Secondly, the plaintiff complains the defendant “set-up” the plaintiff with a series of questions about his physical activities, only to rebut this testimony with video tape and the testimony of a private investigator. The video was actually played during the defense’s cross-examination of Mr. Calvet. While the plaintiff complains bitterly about the video in brief, the only objection we find in the record was to the lack of foundation. At trial, citing LSA-LCE Art. 1007, the court ruled the defense could establish the foundation by playing the video and asking the plaintiff if he was the person in the video. This was done. 'The investigator who took the video also testified at trial and was cross-examined by the plaintiff. LCE Art. 1007 provides, in part, “Contents of writings, recordings, or photographs may be proved by the testimony ... of the party against whom offered ...”. LCE Art. 1001(2) defines “photographs” as including “still photographs, X-ray films, video tapes, motion pictures, and their equivalents.” We do not find the video was shown at trial without a proper foundation.
CONCLUSION
We find the jury clearly erred in assessing any degree of fault in causing the accident to Mr. Calvet, and accordingly, that lupart of the judgment is reversed to find Mr. Calvet free of fault. In all other respects, the trial court’s judgment is affirmed.. Costs of this appeal are assessed between the plaintiff and defendant equally.
REVERSED IN PART; AFFIRMED IN PART; AND RENDERED.

. On October 15, 1992, after the accident, but before the trial, Mr. Graham died from a condition apparently unrelated to the accident.

. While Mrs. Calvet is named in the motion for appeal, appellant’s brief does not contain any specification or assignment of error relating to the loss of consortium award. We consider this issue abandoned. Uniform Rules — Courts of Appeal 2-12.4.

. Dr. Patton described a neuroforamen as the bony passage through which nerves branch off of the spinal cord to other areas of the body.