862 So.2d 338 (2003)
Faye CAMPBELL, Debbie Ann Campbell Watts, and Nelda Campbell Harmond, Plaintiffs-Appellants,
v.
HOSPITAL SERVICE DISTRICT NO. 1 CALDWELL PARISH d/b/a Citizens Medical Center and Dr. Henry H. Nguyen, Defendants-Appellees.
No. 37,876-CA.
Court of Appeal of Louisiana, Second Circuit.
December 10, 2003.
*341 Street & Street, by D. Randolph Street, Monroe, for Appellants.
Watson, Blanche, Wilson & Posner, by P. Chauvin Wilkinson, Jr., Baton Rouge, for Appellee, Citizens Medical Center.
Blue Williams, L.L.P., by Kurt S. Blankenship, Robert I. Baudouin, Metairie, for Appellee, Dr. Henry Nguyen.
Before BROWN, CARAWAY and MOORE, JJ.
CARAWAY, J.
The wife and two daughters of an emergency room patient filed this medical malpractice and wrongful death suit against the hospital and emergency room physician. The patient/decedent presented in the emergency room with chest pains from unstable angina. Within two hours of his hospitalization and after he was admitted into intensive care, he had a massive heart attack. Plaintiffs assert that the heart attack could have been avoided or its effect lessened by the defendants' administration of anti-coagulant drugs. Following a trial, the jury determined that no malpractice had occurred, and the plaintiffs appeal. Finding neither manifest nor legal error warranting reversal, we affirm.

Facts
At approximately 8:15 p.m. on May 21, 1995, seventy-eight year old Eugene Campbell was taken to the Citizens Medical Center ("Citizens") emergency room in Columbia, Louisiana, due to his complaints of chest pain radiating into the jaw and arms. Mr. Campbell was sweating and short of breath. Dr. Henry Nguyen, a contract emergency room physician and otolaryngologist ("ENT") resident, attended Mr. Campbell.
The hospital records indicate that Mr. Campbell was first given nitroglycerin, a drug used to alleviate chest pain, at 8:30 p.m. Thereafter, Dr. Nguyen ordered a cardiac enzyme test and an EKG. The EKG was performed at 8:32 p.m. and interpreted by Dr. Nguyen as reflecting "some ST segment elevation" which he classified as non-specific. The medical evidence disclosed that an elevated or "coving" ST wave can indicate recent blockage restricting blood flow to the heart. The cardiac enzyme tests were negative. The expert medical testimony indicated that the cardiac enzyme test, which examines heart tissue, shows whether an individual has had a heart attack. Mr. Campbell was again administered nitroglycerin at 8:35 and 8:40 p.m.
Initially, Dr. Nguyen diagnosed Mr. Campbell with new onset unstable angina and ruled out a heart attack. Dr. Nguyen opted to admit his patient to the intensive care unit ("ICU") for observation. The medical evidence described unstable angina as the opening and closing of a patient's artery due to the formation of a new clot. *342 The chest pain is caused by inadequate blood flow during the periodic closing of the artery. Dr. Nguyen recalled that Mr. Campbell reported recurring chest and arm pains every thirty minutes. A heart attack occurs when the artery is fully closed by the clot, resulting in heart muscle damage due to the lack of blood flow.
While Mr. Campbell was in the emergency room, Dr. Nguyen did not administer heparin or aspirin. The expert testimony described these drugs as anti-coagulants that may assist in stopping clot growth in unstable angina patients, although they do nothing to reduce the size of already-existing clots.
The attending nurse, Cherry Evans, reported that Mr. Campbell was given morphine for pain at 9:10 and 9:40 p.m. per Dr. Nguyen's verbal orders. Dr. Nguyen did not recall those events regarding the morphine. Mr. Campbell was admitted to ICU at about 9:45 p.m. with Nurse Evans assisting him. Nurse Evans noted that Mr. Campbell was alert and oriented and described Mr. Campbell's appearance, both in the emergency room and ICU, as cool, clammy and pale. Nurse Evans asked Mr. Campbell several times if he was having any pain. Several times the patient denied any pain. Mr. Campbell began receiving oxygen in the ICU through a nasal cannula.
Because Dr. Nguyen had no hospital admitting privileges as an emergency room physician, he set up the initial ICU transfer order under the admitting privileges of Dr. Thompson.[1] Dr. Nguyen testified that it was his normal procedure to then contact the admitting physician. Dr. Nguyen testified that due to the series of events, he was never able to speak with Dr. Thompson after Mr. Campbell's admission to ICU. However, a family witness recalled that Nurse Evans had talked with Dr. Thompson.
Dr. Nguyen again visited with Mr. Campbell at approximately 10:02 p.m. During that visit, immediately before the heart attack, Dr. Nguyen noted that his patient was alert and responsive, had a stable blood pressure and indicated no pain. Likewise, his observation of the cardiac monitor indicated no change in Mr. Campbell's ST wave elevation. Also, Dr. Nguyen testified that Mr. Campbell did not appear cool, clammy or ashen in color at either the last visit at 10:02 p.m. or earlier in the emergency room.
Nevertheless, at 10:05 p.m., Mr. Campbell experienced an acute anterior heart attack that precipitated cardiac arrest. A code blue was instituted and Mr. Campbell was successfully resuscitated by the hospital staff and Dr. Nguyen at approximately 10:15 p.m. Thereafter, Dr. Nguyen contacted Dr. Emile Barrow, a cardiologist at St. Francis Medical Center in Monroe, Louisiana. At Dr. Barrow's instruction, Dr. Nguyen administered heparin and Activase to Mr. Campbell sometime around 10:50 p.m. The medical testimony described Activase as a "clot busting" drug which works to dissolve all blockage in the artery. At the time of Mr. Campbell's heart attack, Activase was administered only after the heart attack due to the "treacherous" risks attendant to the use of the drug prior to a heart attack.
The hospital records show that Dr. Nguyen checked in on Mr. Campbell at 11:45 p.m. and noted that he was then "alert and responsive" and followed commands. At approximately 12:25 a.m., Mr. Campbell was transferred to St. Francis Medical Center in Monroe, where he remained under the care of a cardiologist for several *343 weeks. Thereafter, he was placed in a nursing home facility because of his inability to care for himself after his heart attack. He died on March 19, 1996.
On December 10, 1997, a medical review panel unanimously determined that the hospital and Dr. Nguyen met the applicable standards of care in the treatment of Mr. Campbell. Thereafter, Mrs. Faye Campbell and her two daughters, Debbie Ann Watts and Nelda Harmond ("Plaintiffs"), instituted the present suit.[2] Upon the jury's rejection of their claims, this appeal ensued.

Discussion

I.
On appeal, plaintiffs first argue various specifications of error concerning trial errors which they contend warrant reversal of the jury verdict and de novo review by this court. In the first argument, plaintiffs contend that the verdict form presented to the jury was confusing, complicated and legally wrong. Specifically, plaintiffs take issue with the use of the phrase "under similar circumstances" in reference to the plaintiffs' burden of proof as to the standard of care required of both Dr. Nguyen and the hospital. Plaintiffs contend that this phrase erroneously included the "locality rule," or a comparison of physicians or facilities in the same community or locale, in the determination of the applicable standard of care.
La. R.S. 9:2794 makes a distinction between the specialist and those physicians not practicing in a particular specialty. The non-specialist's duty requires that degree of skill or care "exercised by physicians" "practicing in a similar community or locale and under similar circumstances." La. R.S. 9:2794(A)(1). The specialist, on the other hand, is held under the statute to the degree of care ordinarily practiced by physicians within his medical speciality. Ardoin v. Hartford Accident and Indemn. Co., 360 So.2d 1331 (La. 1978); Taylor v. Sauls, 99-1436 (La. App.3d 9/6/00), 772 So.2d 686, writ denied, 99-2802 (La.12/8/00), 776 So.2d 461. The plaintiffs correctly assert in their brief that Dr. Nguyen was acting as an emergency medical room specialist which has been recognized as a specialty by this court. Iseah v. E.A. Conway Memorial Hosp., 591 So.2d 767 (La.App. 2d Cir.1991), writ denied, 595 So.2d 657 (La.1992). Therefore, the locality rule does not apply, and a jury interrogatory requiring the application of the locality rule would be incorrect.
Misleading or confusing interrogatories, or interrogatories which do not adequately set forth the issues to be decided by the jury, may constitute reversible error. Ford v. Beam Radiator, Inc., 96-2787 (La.App.2d Cir.2/20/98), 708 So.2d 1158; Norfolk Southern Corp. v. California Union Ins. Co., 02-0369 (La.App. 1st Cir.9/12/03), 859 So.2d 167. Nevertheless, the verdict form may not be set aside unless the form is "so inadequate that the jury is precluded from reaching a verdict based on correct law and facts." Ford v. Beam Radiator, Inc., supra; State, DOTD v. McMillion Dozer Service Inc., 93-590 (La.App. 5th Cir.5/31/94), 639 So.2d 766, writs denied, 94-2345, 94-2348 (La. 11/29/94), 646 So.2d 399, cert. denied, 514 U.S. 1108, 115 S.Ct. 1958, 131 L.Ed.2d 850 (1995).
*344 The law is equally clear that the failure to make a contemporaneous objection to either jury interrogatories or a verdict form precludes a party from raising the issue for the first time on appeal. Kose v. Cablevision of Shreveport, 32,855 (La.App.2d Cir.4/5/00), 755 So.2d 1039, writ denied, 00-1289 (La.6/16/00), 765 So.2d 340. Moreover, the objection must be specific to allow the trial judge a fair opportunity to correct any error before jury deliberations. Kose v. Cablevision of Shreveport, supra; Luman v. Highlands Ins. Co., 25,445 (La.App.2d Cir.2/23/94), 632 So.2d 910. It is only when jury instructions or interrogatories contain a "plain and fundamental" error that the contemporaneous objection requirement is relaxed and appellate review is not prohibited. Berg v. Zummo, 00-1699 (La.4/25/01), 786 So.2d 708, at 716, fn. 5; Alcorn v. City of Baton Rouge ex rel. the Baton Rouge Police Dept., 02-0952 (La. App. 1st Cir.6/27/03), 851 So.2d 1194; Etcher v. Neumann, 00-2282 (La.App. 1st Cir.12/28/01), 806 So.2d 826, writ denied, 02-0905 (La.5/31/02), 817 So.2d 105.
From our review of the record, we find that plaintiffs' objection to the jury interrogatories was general and imprecise. Second, the use of the very general phrase, "under similar circumstances," does not expressly utilize the locality rule language as set forth in La. R.S. 9:2794. Finally, and most importantly, the evidence at trial presented no factual dispute regarding a lower standard of care applicable to physicians in Columbia which might have allowed the jury to apply the locality rule to the detriment of the plaintiffs. As discussed below, the parties offered competing testimony of cardiologists and emergency room experts only. Therefore, a fact issue regarding a local standard of care was not present. Accordingly, this assignment of error lacks merit.
Plaintiffs next complain that the trial court committed legal error in allowing the jury to begin deliberations at 9:00 p.m., on a Saturday evening, after approximately twelve hours of proceedings on the day of deliberation and six total days of trial. Plaintiffs contend that justice was not served by giving the complicated, multi-faceted case to the exhausted jury at that late hour.
On Saturday, December 21, 2002, the last day of trial, the jury convened at 9:09 a.m., recessed from 10:35 a.m. until 11:07 a.m. and took a lunch break from 12:10 a.m. until 2:44 p.m. At 4:12 p.m., the court took a twenty-five minute recess, reconvening at 4:38 p.m. until 5:26 p.m., when the completion of evidence occurred and the jury recessed for dinner. The jury heard closing arguments at 7:00 p.m., began deliberations at 9:03 p.m. and returned a verdict at 11:32 p.m.
After completion of the presentation of evidence, counsel and the trial judge gathered for a jury charge conference. At 6:49 p.m., before the jury returned, counsel objected to the proposed jury charges. At that time, counsel for plaintiffs also moved to recess and reconvene for jury deliberations the next afternoon due to the late hour. At the objection, the court noted that it had "promised this jury yesterday we would finish this today. And I have seen the juries in the past, at times, get cases at 7 p.m. and decide it at midnight and come out with what I perceived as a just verdict." The court decided to "proceed, unlessI'll give them that general admonition, and if they vociferously oppose staying any later tonight, I'll consider coming back tomorrow." When the jury returned to the courtroom, the trial judge addressed the jury as follows:
Members of the jury, I apologize for the hour. It certainly has been no one's fault. I promised you all yesterday that *345 we would finish this today. And unless I hear very strenuous objections, that's still my plan. Is that a problem? All right. Plaintiff, you may give your closing argument.
Regarding the choice of the time of day for jury deliberations, the jurisprudence has accorded the trial court great discretion in directing the proceedings before it and has concluded that a trial judge does not err by simply trying to accommodate the jury. Calvet v. Graham, 93-1645 (La. App. 3d Cir.7/6/94), 639 So.2d 873, writ denied, 94-2098 (La.11/11/94), 644 So.2d 393; Jackson v. Ed's Cab Co., 333 So.2d 701 (La.App. 4th Cir.1976), writ denied, 337 So.2d 877 (La.1976). In the criminal arena, the courts have found no deprivation of the right to a fair trial in retiring a jury late in the evening. See, State v. Wright, 445 So.2d 1198 (La.1984) (where the jury was sent to deliberate at 11:00 p.m. rather than waiting until the following day and returned a verdict at 3:00 a.m.); State v. Mack, 435 So.2d 557 (La.App. 1st Cir.1983), writ denied, 440 So.2d 727 (La. 1983) (where jury deliberation began at 10:40 p.m. and ended at 1:50 a.m.). The courts have also approved of late hour deliberations when the trial court afforded the jury the choice of finishing the trial that night or continuing the following morning. Calvet v. Graham, supra; Jackson v. Ed's Cab Co., supra.
In the present matter, we can discern no abuse of discretion in the trial court's submission of the case to the jury at 9:00 p.m. Although the trial was undeniably prolonged and required consideration of five days of medical evidence and testimony, the record shows that the jury was never seated in the courtroom until, at the very earliest, after nine in the morning. With ample breaks and recesses on each day of trial, the jury remained in the courtroom for less than five hours. On the final day of trial, the jury heard evidence for approximately 4.75 hours, but recessed over six hours, including a three and one-half hour lunch break and a one and one-half hour dinner break between the completion of evidence and the closing arguments. Finally, when given the choice of continuing that night, the jury chose to complete the trial at the late hour rather than continue it to Sunday. Based upon these facts and plaintiffs' failure to present proof that the jury's impartiality was tainted by exhaustion or an inappropriate effort to rush the verdict, we can find no abuse of discretion in the trial court's choice of time for jury deliberation.
Plaintiffs next contend that the trial court erred in denying their motion to read Mrs. Faye Campbell's deposition to the jury because she experienced difficulty testifying at trial. After Mrs. Campbell's direct examination and at the close of cross, plaintiffs' counsel attempted to introduce the 1996 deposition. At the time of trial in 2002, Mrs. Campbell was eighty years old. Mrs. Campbell testified on direct examination that she recalled no conversation with Dr. Nguyen on the night of her husband's heart attack. Plaintiffs now argue that she testified in her deposition concerning such a conversation. Plaintiffs' counsel argued that Mrs. Campbell should be considered "unavailable" under La. C.E. art. 804 and La. C.C.P. art. 1450, so that her deposition could be introduced into evidence in addition to her trial testimony.
La. C.C.P. art. 1450 establishes the guidelines for the use of a deposition at trial. In pertinent part, those provisions allow for the introduction of deposition testimony if the court finds that the witness is unavailable or "upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to *346 the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used." La. C.E. art. 804 addresses hearsay exceptions and, in pertinent part, defines witness unavailability as the situation "when the declarant cannot or will not appear in court and testify to the substance of his statement made out of court." Such unavailability includes circumstances where the declarant testifies to a lack of memory of the subject matter of his statement or is unable to be present to testify at the hearing because of existing physical or mental illness, infirmity or other sufficient cause.
Additionally, La. C.E. art. 612 allows a witness to refresh his or her memory with a writing and the adverse party to introduce into evidence those portions of the writing which refreshed the witness's memory and to examine the witness thereon.
The above rules of evidence and procedure lend no support to the plaintiffs' argument. The direct testimony of Mrs. Campbell concluded without presenting any issue regarding her inability to testify or the need for deposition evidence. The record before us reflects a competent witness. Most significantly, when she denied in her testimony that she had spoken with Dr. Nguyen, her counsel did not attempt to refresh her recollection pursuant to La. C.E. art. 612 by reference to the conversation which she purportedly reported in her deposition seven years earlier. The cross-examination of Mrs. Campbell did not mention Dr. Nguyen or any conversation he may have had with Mrs. Campbell, although the defense did use portions of her deposition to refresh her memory regarding the status of her husband's health after the heart attack. The trial court's rejection of plaintiffs' offering of the deposition was, therefore, in accordance with law and within its discretion.
The final trial court error asserted by plaintiffs concerns the admission into evidence of a survey-opinion article from the New England Journal of Medicine ("NEJM"). During the cross-examination of Dr. David Tepper, plaintiffs' medical expert in cardiovascular diseases and internal medicine, he was questioned about a 1997 NEJM article that included information on the use of aspirin or heparin. At that time, counsel for plaintiffs objected to the admission of the article on the ground that it would mislead or confuse the jury because the article reflected the standard of care in 1997 rather than 1995. The trial court denied plaintiffs' motion. On appeal, plaintiffs argue that the article should not have been admitted into evidence because it pertained to a survey of research not conducted by the authors.
Because plaintiffs never asserted the issue of hearsay to the trial court, they are precluded from raising it on appeal. URCA Rule 1-3; Risinger v. State Farm Mut. Auto. Ins. Co., 29,023 (La.App.2d Cir.6/18/97), 711 So.2d 293. Moreover, Dr. Tepper testified that the NEJM was considered an authoritative journal. Therefore, it is not considered hearsay under the La. C.E. art. 803 learned treatise exception to the hearsay rule and can be used by counsel to cross-examine an expert witness. Denton v. Critikon, Inc., 95-1602 (La.App. 1st Cir.5/10/96), 674 So.2d 1169.

II.
Next, plaintiffs challenge the jury's verdict claiming that the record contains no factual basis for the verdict and that it is manifestly erroneous and should be reversed. Specifically, plaintiffs argue that the expert testimony clearly established that the standard of care for a patient like Mr. Campbell required the administration of heparin and aspirin in the *347 emergency room. They contend that Dr. Nguyen's failure to follow that standard of care deprived Mr. Campbell of a significant chance of avoiding the heart attack and cardiac arrest that resulted in the dementia which ultimately caused his death.
To establish a medical malpractice claim, the plaintiff must prove by a preponderance of the evidence the following elements as set forth in La. R.S. 9:2794(A):
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
Thus, the plaintiff must establish the standard of care applicable to the charged physician, a violation by the physician of that standard of care, and a causal connection between the physician's alleged negligence and the plaintiff's injuries resulting therefrom. Pfiffner v. Correa, 94-0924 (La.10/17/94), 643 So.2d 1228; Strange v. Shroff, 37,353 (La.App.2d Cir.7/16/03), 850 So.2d 1077.
A physician is not held to a standard of absolute precision; rather, his conduct and judgment are evaluated in terms of reasonableness under the circumstances existing when his professional judgment was exercised, and not on the basis of hindsight or in light of subsequent events. Johnston ex rel. Johnston v. St. Francis Medical Center Inc., 35,236 (La.App.2d Cir.10/31/01), 799 So.2d 671; Wilson v. Winn Parish Medical Center, 34,882 (La. App.2d Cir.6/20/01), 793 So.2d 268.
In a medical malpractice action, opinions of expert witnesses who are members of the medical profession are necessary to determine whether the defendant possessed the requisite degree of knowledge or skill, or failed to exercise reasonable care and diligence. Id. However, the necessity for expert evidence is abolished as to the standard of care required by the hospital or doctor where a reasonable juror can conclude that negligence has occurred. Estate of Wilburn v. Leggio, 36,534 (La.App.2d Cir.3/19/03), 842 So.2d 1175, writ denied, 03-1096 (La.6/6/03), 845 So.2d 1095. It is well-established that where medical disciplines overlap, a specialist in one field may give expert testimony as to the standard of care applicable to areas of the practice of medicine common to both disciplines. Campbell I, supra; Corley v. State, Department of Health and Hospitals, 32,613 (La. App.2d Cir.12/30/99), 749 So.2d 926, 931.
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of manifest error or unless it is clearly wrong. Etcher v. Neumann, supra, citing Rosell v. ESCO, 549 So.2d 840 (La.1989); Satterwhite v. Reilly, 35,926 (La.App.2d Cir.5/8/02), 817 So.2d 407; writ denied, 02-1552 (La.9/30/02), 825 *348 So.2d 1193, citing Stobart v. State, through Dep't of Transp. & Dev., 617 So.2d 880 (La.1993). When there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Etcher v. Neumann, supra. Therefore, the issue for the reviewing court is not whether the trier of fact was wrong, but whether the factfinder's conclusions were reasonable under the evidence presented. Id. The appellate court should not substitute its opinion for the conclusions made by the trial court, which is in a unique position to see and hear the witnesses as they testify. Satterwhite v. Reilly, supra.
In support of their respective positions, the parties presented copious expert medical testimony from cardiologists, emergency room experts and ENT's, as well as testimony from the nursing staff at Citizens. Additionally, Mr. Campbell's medical records were introduced into evidence. Drs. Barrow and Shroff, Mr. Campbell's treating cardiologist and primary care physician, also offered testimony.
Dr. Nguyen's background and experience revealed two months of training in emergency room care during his internship at UCLA Medical Center. During his ENT residency at LSUMC in Shreveport, he underwent further emergency room training lasting from four to six months. He also began working in other emergency rooms for the Gould Group, which contracted his services to Citizens. The Gould Group required certification in advanced life cardiac support and the completion of one year of residency by its physicians. Dr. Nguyen was subject to Citizens' policies and procedures, and could be dismissed by them as well. He worked for Citizens several times. Prior to May 21, 1995, he had evaluated patients experiencing chest pain in an emergency room setting and recognized chest pain as symptomatic of an emergency room treatment priority.
Dr. Nguyen testified that after reviewing Mr. Campbell's medical history, his primary concern was the possibility of a heart attack. Therefore, he ordered cardiac enzymes, an EKG and blood tests. The EKG was performed at 8:32 p.m. and Dr. Nguyen noted "some ST segment elevation." Dr. Nguyen explained that the segment elevation was not very impressive and non-specific. Prior to the EKG, Mr. Campbell was given nitroglycerin. Dr. Nguyen stated that although the non-specific EKG did not suggest a myocardial infarction, it did not rule out a heart attack either. He did not call a cardiologist because in his experience, the heart doctor would have been upset by such a call under the circumstances. Rather, he decided to continue to observe Mr. Campbell. At 8:35 and 8:40 p.m., Mr. Campbell was again given nitroglycerin which relieved his chest pain but caused his blood pressure to drop. The patient was given fluids to alleviate this problem. Ultimately, Dr. Nguyen diagnosed Mr. Campbell with new onset unstable angina, and, because he had no history of coronary artery disease, ruled out myocardial infarction. Dr. Nguyen stated that, in his experience, it is very rare for a person who presents with unstable angina to go into a full-blown heart attack.
Dr. Nguyen explained that he did not order aspirin or heparin for Mr. Campbell because it was not uniformly given by emergency room physicians at that time. He stated that in neither his extensive training nor his experience in emergency room medicine was he ever taught that the administration of heparin or aspirin was within the standard of care. In fact, it was *349 normally given by the admitting physician. He stated in his deposition that administering aspirin was controversial and that he did not give heparin because of the risk of bleeding.
In support of their position that Dr. Nguyen violated the standard of care in failing to administer aspirin and heparin, plaintiffs presented the testimony of their expert, Dr. David Tepper. Dr. Tepper testified that, in his opinion, Dr. Nguyen's diagnosis of unstable angina was correct. However, he disagreed that the 8:32 p.m. EKG ruled out a heart attack because the "ST" wave elevation would not exist on a normal EKG. The elevated waves indicate a blood flow or blockage problem. From Dr. Tepper's review of the EKG, Mr. Campbell was at high risk for a heart attack. Because of Mr. Campbell's condition, Dr. Tepper felt that Dr. Nguyen should have administered aspirin and heparin to prevent the clot from permanently forming or getting bigger. Dr. Tepper characterized the anti-coagulant drugs as the "backbone" of unstable angina treatment. Dr. Tepper concluded that Dr. Nguyen's failure to do so fell below the 1995 standard of care for any physician, thereby depriving Mr. Campbell of a significant chance of avoiding or reducing the magnitude of his heart attack.
Dr. Tepper was also questioned about a February, 1995 Emergency Medical Association's Journal ("EMAJ") article regarding the applicable standard of care for this case. The article described rules and guidelines for the diagnosis and treatment of unstable angina. In reviewing the article, Dr. Tepper concluded that Mr. Campbell fell within the "ongoing or recurrent ischemia" category of angina because his continued pain in the emergency room required the administration of morphine at 9:10 and again at 9:40 p.m. This qualified Mr. Campbell's condition as recurrent. For that diagnosis, the EMAJ article set forth a "rule" that required the administration of heparin and aspirin. The "guidelines" provided by the article suggested that repetitive EKG's be performed, as well as cardiac imaging and a chest x-ray. Dr. Tepper testified that the article described "rules" as those things which should be performed and that an explanation by the doctor was required for not doing so. "Guidelines," on the other hand, were discretionary. The administration of heparin and aspirin for the "ongoing or recurrent ischemia" type of angina was a rule on the day of Mr. Campbell's admission to the emergency room according to the EMAJ. Dr. Tepper testified that the medical records reflected no explanation for deviation from the rule. He also explained that because heparin was administered to Mr. Campbell after his heart attack, the administration of heparin before the heart attack was not contraindicated. Dr. Tepper admitted, however, that age can be a contraindication to heparin administration, albeit a controversial one.
On cross-examination, Dr. Tepper acknowledged that the "ST" wave elevation was subtle in this case and that the 8:30 p.m. EKG did not clearly indicate a heart attack. He was also aware of the fact that Mr. Campbell's primary care physician prescribed daily aspirin for this patient. While Dr. Tepper did not know whether Mr. Campbell followed this aspirin regimen, he admitted that if he had done so, he could not say that taking one more aspirin in the emergency room would have made a difference.
Dr. David Elizardi, an expert in cardiology, testified on behalf of the defendants. Dr. Elizardi explained that unstable angina is a frequently occurring condition in which chest discomfort develops for the first time. Dr. Elizardi stated that treatment *350 for unstable angina was not the same for different types of physicians, i.e., a cardiologist or emergency room physician, because of each physician's unique role. The emergency room doctor's job is to stabilize the patient and hand him off to the specialist who treats the condition. Neither would an emergency room doctor interpret an EKG in the same way that a cardiologist would because of the difference in training. Dr. Elizardi characterized the EKG as "non-specific," meaning it did not meet the criteria for anticipating the heart attack process. When a person has a heart attack, the EKG is very specific in representing that condition. Dr. Elizardi explained that only 2-5% of unstable angina patients go on to have heart attacks.
Dr. Elizardi did not believe that the administration of an aspirin to Mr. Campbell would have prevented his heart attack assuming he was taking aspirin daily as prescribed. He admitted that now, aspirin is given promptly in the emergency room due to a greater understanding of the process, but that this was not the standard in 1995. Neither did Dr. Elizardi think that the administration of heparin would have changed the process due to the short interval between the chest pain and heart attack. He explained that, in the unstable angina and full blown heart attack patient, the clotting process has already formed and heparin would not act to dissolve that clot. He expressed his opinion that in Mr. Campbell's case, the clotting process had already begun.
On cross-examination, Dr. Elizardi admitted that, as a cardiologist, he would have been thinking about the possibility of a heart attack and certain other diagnostic treatment, not including medication. An emergency room physician, however, would not have that avenue available to him. Dr. Elizardi opined that treatment of coronary syndromes such as this one should be done by a specialist. He did not think that the case of a patient with chest pains and a non-specific EKG required an immediate consultation by a cardiologist. He thought the admit to ICU was a good choice. Finally, Dr. Elizardi admitted that the standard of care for cardiologists in 1995 included the administration of heparin and aspirin for treating unstable angina. Nonetheless, he did not believe that even a cardiologist could have done anything to stop Mr. Campbell's heart attack.
Dr. Todd Thoma, an expert in the field of emergency room medicine, testified for defendants. In addition to his past and current emergency room experience, Dr. Thoma had taught emergency room medicine at LSU Medical Center in Shreveport since 1994. Dr. Thoma testified that 30% of emergency room patients at LSUMC present with chest pain. Residents are taught how to differentiate the diagnoses of chest pain. Dr. Thoma believed that Dr. Nguyen "did a commendable job and met the standard of care in all facets." He explained that the 8:32 p.m. EKG was non-specific and suggested some early ischemia but not an acute heart attack. He felt that Dr. Nguyen made the correct diagnosis in this case and appropriately transferred the patient to ICU.
Regarding Dr. Nguyen's failure to administer aspirin or heparin to Mr. Campbell in the emergency room, Dr. Thoma testified that he did not believe Dr. Nguyen violated the standard of care because, in 1995, studies indicated only 50% of people who presented with heart attacks were getting aspirin. This percentage included treatment by cardiologists, internists, family practitioners and emergency room doctors. Not only was it not the standard, it was not common practice. Moreover, because Mr. Campbell's heart attack transpired *351 over a very short period of time, within two hours, Dr. Thoma felt that aspirin would have not have had time to take effect.
Dr. Thoma also did not believe that Dr. Nguyen violated the standard of care in failing to administer heparin, because heparin is a controversial drug that has many contraindications, including age. Dr. Thoma noted that in 1995 and today, the administration of heparin is not the standard of care for emergency room physicians. In fact, he felt that at the time of Mr. Campbell's angina, the majority of doctors would have done nothing that would have affected Mr. Campbell's clotting. Dr. Thoma described the standard of care for emergency room physicians as encompassing diagnoses and treatment. He felt that Dr. Nguyen acted within that standard of care.
When questioned regarding the EMAJ article, Dr. Thoma did not agree that the February 1995 article would have established the standard of care for May of 1995. In his opinion, the article merely set forth guidelines that do not establish the standard of care. Dr. Thoma stated that a large number of medical journals publish these types of articles for doctors. He explained that the purpose of such articles is to eventually change behavior as clinical evidence on any given subject becomes stronger, but the articles do not dictate the standard of care. In 1995, the medical evidence did not indicate that the administration of these drugs was required to meet the standard of care.
The standard of care was, therefore, the critical dispute in this case which rested in large part on the competing opinions of the expert physicians and the authoritative medical journals. The jury's choice in this case of the opinions of Dr. Nguyen's expert witnesses was not clearly wrong because we find those opinions reasonable under the evidence presented. Dr. Nguyen's clinical judgment was formed by reading the EKG, his training as an emergency room physician, and his observations of the patient during that first critical hour. In just over an hour, Mr. Campbell was in ICU. The only testimony from emergency room physicians was presented by the defense, and they both testified that the administration of aspirin and heparin was not the standard of care for an emergency room physician in 1995. Dr. Thoma provided a reasonable explanation that one medical journal article, such as the February 1995 EMAJ article relied upon by plaintiffs, could not set the standard of care, but only formed a part of the body of medical evidence at that time. The administration of the two anti-coagulant drugs, which later became the standard, were only within the emerging trend of thought in 1995 and still awaiting further data from clinical trials by which they would be established as the standard. The reading of the EKG and the weighing of the propriety of the two drugs would no doubt have been seen differently by a cardiologist, but Dr. Nguyen was not held to that standard of care. Accordingly, we affirm the ruling by the jury that Dr. Nguyen's actions in treating Mr. Campbell were within the standard of care for emergency room physicians.

III.
The final two assignments pertain to plaintiffs' claim against Citizens. Plaintiffs contend that the trial court erred in giving or failing to give the jury certain requested instructions. One instruction concerned a hospital's vicarious liability for the negligence of a physician. That assigned error is now moot because of our affirmation of the jury's verdict in favor of Dr. Nguyen.
*352 Plaintiffs next object to the failure of the trial court to instruct the jury as follows:
In addition, the absence of specific orders by the treating physician is not fatal to a plaintiff's personal injury claim alleging hospital negligence because the patient is entitled to rely upon the hospital's expertise and independent professional judgment to supplement the treating physician's direct orders when necessary to afford the patient the safe and reasonable healthcare the hospital is obligated to provide.
The above language is taken from this court's ruling in Campbell I, supra.
On appeal, plaintiffs argue that the failure to include this instruction caused a lack of the full understanding by the jury of the duty of hospital personnel which exists independently of a physician's orders or actions. Plaintiffs argue that this inquiry was important to whether or not the attending nurses should have sought to transfer Mr. Campbell to another hospital despite Dr. Nguyen's orders or should have contacted Dr. Thompson or another physician regarding medication.
The trial court is not required to give the precise instruction submitted by a litigant, but need only give instructions which properly reflect the applicable law. Smart v. Kansas City Southern R. R., 36,404 (La.App.2d Cir.11/6/02), 830 So.2d 581; Hanley v. Doctors Hospital of Shreveport, 35,527 (La.App.2d Cir.6/6/02), 821 So.2d 508. To determine the sufficiency of a jury charge, all charges should be read together as a whole. Id.
Instead of the above instruction requested by the plaintiffs, the trial court charged the jury as follows:
With regard to the hospital, you are charged that a hospital has a direct obligation and duty of care to its patients, which is independent of any obligation or duty owed by the treating physician. A hospital must exercise the requisite amount of care toward a patient that his or her particular condition may require.
A determination of whether a hospital has breached the duty of care owed a patient depends upon the circumstances and facts of each case.
Strict adherence to the physician's orders cannot excuse the failure to provide safe and reasonable care to the patient or preclude a finding of negligence on the part of the hospital.
We find the instruction given by the trial court to have adequately set forth the law of hospital liability without the necessity of including the language suggested by plaintiffs. The subject instruction was adequate to inform the jury that the duty of hospital employees to utilize their best independent professional judgment may, in certain circumstances, precipitate that employee to act outside of a physician's orders or inaction.
Beyond plaintiffs' critique of the jury instruction, they make no argument specifically pointing out to this court how the jury was manifestly erroneous in placing no liability on Citizens. Their meager assertions concerning the nurses' actions or inactions were based on the premise that Dr. Nguyen's care of Mr. Campbell was negligently administered. Our affirmance of the verdict that Dr. Nguyen was free from fault therefore also absolves the nurses who acted under his orders.

Conclusion
For the foregoing reasons, we reject plaintiffs' claims of legal error and find no manifest error in the jury verdict. The judgment is affirmed at appellants' costs.
AFFIRMED.
NOTES
[1] Dr. Thompson did not testify, and although she was referred to as Mr. Campbell's treating physician, her medical specialty was not provided in the evidence.
[2] In two earlier appeals to this court, we reversed partial and full summary judgments in favor of Citizens Medical Center and the plaintiffs. See, Campbell v. Hospital Service District No. 1, Caldwell Parish, 33,874 (La. App.2d Cir.10/4/00), 768 So.2d 803, writ denied, 00-3153 (La.01/12/01), 781 So.2d 558 (hereinafter "Campbell I") and Campbell v. Hospital Service District No. 1, Caldwell Parish, 35,015 (La.App.2d Cir.8/22/01), 793 So.2d 521 (hereinafter "Campbell II").