# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 11-587


**PATRICIA BOURQUE**

**VERSUS**

**ESSEX INSURANCE CO., ET AL.**



\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2003-4398
HONORABLE ROBERT LANE WYATT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## JOHN D. SAUNDERS
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, John D. Saunders, Jimmie C. Peters, Marc T. Amy and Billy H. Ezell, Judges.


**JURY VERDICT VACATED AND JUDGMENT RENDERED.**

**Cooks, J., concurs and assigns written reasons.**
**Amy, J., dissents and assigns reasons.**
**Ezell, J., dissents and assigns written reasons.**

Raleigh Newman
Newman, Hoffoss & Devall
1830 Hodges St.
Lake Charles, LA 70601
(337) 439-5788
Counsel for Plaintiff Appellant:
Patricia Bourque

**Donald Wayne McKnight**
**Newman, Hoffoss & Devall, LLP**
**1830 Hodges Street**
**Lake Charles, LA 70601**
**(337) 439-5788**
**Counsel for Plaintiff Appellant:**
**Patricia Bourque**

**Michael Joey Bernard**
**Burglass & Tankersley, LLC**
**5213 Airline Drive**
**Metairie, LA 70001-5602**
**(504) 836-2220**
**Counsel for Defendant Appellee:**
**Essex Insurance Co.**
**Donald Lack Construction, Inc.**

**André Collins Gaudin**
**Burglass & Tankersley, LLC**
**5213 Airline Drive**
**Metairie, LA 70001-5602**
**(504) 836-2220**
**Counsel for Defendant Appellee:**
**Essex Insurance Co.**
**Donald Lack Construction, Inc.**

**Barry Alwin Roach**
**Larry A. Roach, Inc.**
**2917 Ryan St.**
**Lake Charles, LA 70601**
**(337) 433-8504**
**Counsel for Plaintiff Appellant:**
**Patricia Bourque**

**Claude P. Devall**
**Newman, Hoffoss & Devall, LLP**
**1830 Hodges St.**
**Lake Charles, LA 70601**
**(337) 439-5788**
**Counsel for Plaintiff Appellant:**
**Patricia Bourque**

**J. Lee Hoffoss, Jr.**
**Newman, Hoffoss & Devall, LLP**
**1830 Hodges Street**
**Lake Charles, LA 70601**
**(337) 439-5788**
**Counsel for Plaintiff Appellant:**
**Patricia Bourque**

**SAUNDERS, Judge.**

This is a personal injury case wherein the plaintiff contends that she suffered damages from the fall of an improperly installed kitchen light fixture on August 19, 2002. The defendants contend that the plaintiff failed to carry her burden to prove that this accident occurred or, alternatively, that she was injured by the falling fixture.

Two separate jury trials were completed. In both, a compound jury interrogatory asked whether the plaintiff carried her burden to prove that an accident occurred that injured her. The jury's negative response in both trials left this court with an inability to determine the jury's intent. As such, we vacated the jury's verdict, found the record before us to be complete, conducted a de novo review of that record, and rendered judgment in favor of the plaintiff.

**FACTS AND PROCEDURAL HISTORY:**

On August 19, 2002, Patricia Bourque (Bourque), after returning home from work, was ironing in her kitchen. Present in the home were Bourque's now former husband, Jerry, and Ronald Lynn Smith, a family friend.

Her home had been remodeled four months prior by Donald Lack Construction, Inc. (Lack Construction) due to water damage the home had sustained from a faulty hot water heater. As part of that remodeling, a two bulb, four foot fluorescent light fixture was installed in Bourque's kitchen.

Donald Lack, owner of Lack Construction, personally installed the fixture. According to Donald Lack, he was helped in installing the fixture by a carpenter, Danny Moore; however, Moore does not remember helping Donald Lack install

said fixture. After some difficulty in installing the fixture, it was eventually installed using two toggle bolts.[1]

Donald Lack testified that he is certain that the spring-loaded wings of the toggle bolt engaged because he heard them do so. He did not visually inspect whether they engaged because a new layer of insulation had been laid on the ceiling where he was installing the fixture. This layer of insulation would block the view of anyone looking to see if the wings of the toggle bolt had indeed engaged. Therefore, according to Donald Lack, he performed a test whereby he shakes the fixture to ensure that it has been installed sufficiently.

According to Bourque, Jerry, and Smith, while Bourque was ironing, the fixture fell from the ceiling, struck Bourque on the right side of her head, knocked her unconscious, and caused her to fall and injure her head, neck, low back, and shoulder. Jerry and Smith were talking in the living room of the house and could not actually see Bourque ironing. They both contend that they heard a loud noise and rushed to the kitchen to find Bourque lying on the ground and the fixture hanging by its wiring.

Once she became oriented, according to the testimony of Bourque and Jerry, Bourque refused to go to the hospital in hopes that any injuries she had from the falling fixture were minor. However, coincidentally, later that evening, Bourque's lips and face began to swell. Bourque did not attribute this swelling to any injury from the fixture striking her because the area of the swelling was different from where the fixture had struck her. Because Bourque became frighteningly concerned that the swelling would progress so as to interrupt her breathing, she

---

[1] Toggle bolts are made up of two parts: (1) a threaded bolt and (2) a nut with spring-loaded wings. Toggle bolts are used to fasten objects to thin or hollow ceilings by first drilling a hole in the ceiling. Next, the nut with spring-loaded wings is attached to the end of the threaded bolt. Thereafter, the spring-loaded wings are pinched together and inserted through the drilled holes with the head of the threaded bolt on one side of the ceiling while the spring-loaded wings are on the other side of the ceiling. Once the spring-loaded wings are through the ceiling they spring open so as to provide support for the object. Finally, the threaded bolt is tightened, thereby, attaching the object to the ceiling.

went to the emergency room. The emergency room physician diagnosed her with angioedema, an allergic reaction likely due to her blood pressure medicine. Angioedema usually causes swelling in the face and hands. According to hospital records, Bourque made no mention of the fixture striking her.

Bourque was kept overnight by the hospital and saw her family physician the next day and was released to go home. Jerry contends that he told the family physician about the fixture striking Bourque that morning. However, the physician had no recollection of that conversation, nor did he document Jerry's alleged report of the incident to him, as he was focused on the medical issue that hospitalized Bourque, angioedema.

Bourque returned to work the day after she was released from the hospital. On that day her boss noticed some facial bruising and inquired about their origination. Bourque told him about the fixture striking her.

Approximately a month transpires wherein, according to Bourque's boss, Bourque's physical condition worsened. At the behest of her boss, Bourque sought medical treatment for pain and suffering she contends resulted from the fixture striking her on August 19, 2002.

Bourque filed suit against Lack Construction, Donald Lack, and Essex Insurance Company (collectively Lack) on August 15, 2003. They responded with a general denial and a request for a jury trial. The first jury trial began on June 23, 2008. The case was submitted to the jury on July 3, 2008. The first jury verdict was that Bourque failed to carry her burden of proof that on August 19, 2002, the fixture fell and injured her. Bourque was granted a request for a new trial on November 18, 2008. Thereafter, a second trial commenced on October 18, 2010. The jury in the second trial also found that Bourque had failed to carry her burden to prove that the fixture fell and injured her on August 19, 2002. Bourque then

3

filed this appeal alleging three assignments of error. Lack answered and alleged a single assignment of error.

## ASSIGNMENTS OF ERROR BOURQUE:

1. The trial court erred in allowing defense expert, J.P. "Sonny" Launey to testify;

2. The trial court erred in denying plaintiff's *Daubert* Motion relative to the testimony of defense expert, J.P. Launey;

3. The jury erred in failing to find defendant, Donald Lack Construction, [Inc.] at fault.

## ASSIGNMENT OF ERROR LACK:

1. The trial judge improperly granted [Bourque's] request for new trial after the matter was initially tried in June/July 2010.

## APPLICABLE STANDARD OF REVIEW:

As a preliminary matter, prior to any discussion of the assignments of error raised by either party, we must first address what weight, if any, we should give to the jury's verdict. Bourque argues in her first two assignments of error that this court should totally disregard the jury's verdict and perform a *de novo* review of the record because the trial court erroneously allowed Lack's expert, J.P. "Sonny" Launey, to testify. According to Bourque, Launey's testimony tainted the jury's verdict. Moreover, Bourque argues that the jury erred in failing to find that Lack was at fault.

Lack argues that the trial court properly allowed Launey to testify and that this court should perform a manifest error review of the facts found by the jury. Lack contends that because both juries apparently reached both the issue of whether an accident occurred and whether Bourque was injured, this court should review those findings under the well-settled manifest error standard of review as found in *Stobart v. State, through DOTD*, 617 So.2d 880 (La.1993).

4

This court, in *Lewis v. Wal-Mart Stores, Inc.*, 546 So.2d 267, 274 (La.App. 3 Cir. 1989), stated the following:

> If the trial court submits a verdict form to the jury with misleading or confusing interrogatories, . . . such interrogatories do not adequately set forth the issues to be decided by the jury and may constitute reversible error. The manifest error standard of appellate review may not be ignored unless the proposed jury interrogatories are so incorrect or inadequate as to preclude the jury from reaching a verdict based on the law and the facts.

It is clear from the record that Bourque did not object to this jury instruction in either trial. Normally, when a party fails to object to jury charges on the trial level, the right to have appellate review of that jury charge is waived. *Libersat v. J & K Trucking, Inc.*, 00-192 (La.App. 3 Cir. 10/11/00), 772 So.2d 173, *writ denied*, 01-458 (La.4/12/01), 789 So.2d 598. However, when a jury charge contains a "plain and fundamental error," appellate review is not prohibited. *Beard v. Coregis Ins. Co.*, 07-314, p.4 (La.App. 3 Cir. 10/17/07), 968 So.2d 278, 282 (citing *Campbell v. Hospital Serv. Dist. No. 1 Caldwell Parish*, 37,876 (La.App. 2 Cir. 12/10/03), 862 So.2d 338, *writ denied*, 04-69 (La.3/19/04), 869 So.2d 852).

In the case before us, for both the first and second trials, the jury only answered the first interrogatory. It read:

> Do you find, by a preponderance of the evidence, that an accident occurred on or about August 19, 2002, injuring the plaintiff, Patricia Bourque?
>
> YES _____          NO _____

In both trials, the jury selected "NO." Standing alone, the interrogatory, while a compound question, is not confusing. However, the interrogatory, coupled with the negative response, renders it impossible for this court to determine the jury's intent or whether a valid verdict was reached. Thus, we find that this jury instruction contains a "plain and fundamental error." *Id.*

5

The interrogatory asks both whether the jury found that an accident happened and, if so, whether that accident injured Bourque. When the jury answered the interrogatory in the negative, it created multiple problems that hinder this court's review of the case.

The jury could have answered as it did based upon a finding that an accident occurred, but Bourque was not injured because of that accident. However, it also could have answered as it did based upon a finding that no accident occurred at all. Thus, while the manifest error standard of review would apply the finding of facts made by the jury, this court cannot determine what fact the jury actually found.

Additionally, we are unable to determine if the jury even considered whether the accident caused any injuries to Bourque. Therefore, with regards Bourque's assignment of error number three, we cannot conclude if the applicable standard of review on this issue is *de novo* per *LeBlanc v. Stevenson*, 00-157 (La. 10/17/00), 770 So.2d 766, or manifest error per *Stobart*, 617 So.2d 880.

A final scenario could have also resulted from the compound interrogatory and negative response. That scenario is that some members of the jury, i.e. less than nine, could have found that no accident occurred while others could have found that an accident occurred, but Bourque was not injured in that accident.

Louisiana Code of Civil Procedure Article 1797 (B) (emphasis added) states, "[i]f trial is by a jury of twelve, nine of the jurors *must* concur to render a verdict unless the parties stipulate otherwise." Here, the jury included twelve members, and there was no stipulation that less than nine jurors was acceptable to render a verdict.

We cannot determine from the record if nine jurors concurred on any finding of fact. Thus, this court cannot ascertain whether the jury actually reached a verdict.

6

Accordingly, we find that no weight should be given to the jury's verdict. The compound jury interrogatory and negative response render it impossible for this court to determine the jury's intent or even whether the jury reached a valid verdict. As such, it contains a "plain and fundamental error." *Beard*, 968 So.2d at 282.

Next, we must decide whether to remand the case for a third jury trial or render a judgment on the record. We find that rendering judgment is appropriate.

"The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal." La.Code Civ.P. art. 2164. The Louisiana Supreme Court, in *Gonzales v. Xerox Corp.*, 254 La. 182, 320 So.2d 163, 165–66 (1975) (citations and footnote omitted), stated the following:

> While the trial court remains the original forum for resolving factual and legal issues, the Louisiana Constitution expressly extends the jurisdiction of appellate courts in civil cases to the review of facts as well as law. . . .

> In addition to the constitutional authority, and consistent with it, there is a very practical consideration which encourages our appellate courts to exercise their jurisdiction to review factual findings: judicial economy. When the entire record is before the appellate court, remand for a new trial produces delay of the final outcome and congestion of crowded dockets while adding little to the judicial determination process. Although the appellate court does not gain the benefit of personally viewing the witnesses, it does have a complete record and the constitutional authority to decide.

Two full trials on the merits are contained in the voluminous record before us. Both parties have submitted numerous exhibits and testimonies, and neither party suggests that any other relevant evidence is outstanding. Therefore, we will conduct a *de novo* review of the record to fully adjudicate this case.

## DISCUSSION OF THE MERITS:

In this case, Bourque brought a negligence action against Lack under La.Civ.Code art. 2315(A). She based her claim on an allegation that Donald

Lack's installation of the fixture was faulty and that faulty installation was both a cause-in-fact of the kitchen light falling and striking her and a legal cause of her injuries.

Louisiana Civil Code 2315(A) states, "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." The Louisiana Supreme Court, in *Roberts v. Benoit*, 605 So.2d 1032, 1041 (La.1991), stated the following:

> The standard negligence analysis we employ in determining whether to impose liability under Civil Code Article 2315 is the duty-risk analysis, which consists of the following four-prong inquiry:
>
> I. Was the conduct in question a substantial factor in bringing about the harm to the plaintiff, i.e., was it a cause-in-fact of the harm which occurred?
>
> II. Did the defendant owe a duty to the plaintiff?
>
> III. Was the duty breached?
>
> IV. Was the risk, and harm caused, within the scope of protection afforded by the duty breached?

*Prerequisite Fact Finding – Did an accident occur?*

Prior to conducting a duty/risk analysis, we must first make two findings of fact. The first is whether Bourque carried her burden to prove that an accident happened. The second is how Donald Lack actually installed the fixture.

Bourque contends that it is uncontroverted that an accident occurred. Lack disagrees. Bourque's testimony regarding whether the accident happened is steadfast. She testified to the following:

Q    Did this light actually hit you the night of August 19th, of 2002?

A    Yes, sir.

     . . . .

Q    You told the jury, [Bourque], that a light fixture came down from the roof, from the ceiling of your kitchen, striking your head and

8

shoulder and knocking you to the floor on August 19, 2002. Are you sure about the date?

A    It's the same day that I went to the emergency room for my mouth swelling.

Jerry, Bourque's former husband and not a party to this litigation, corroborated her testimony. An excerpt of his testimony is as follows:

Q    Okay. Did you ever have a conversation with Dr. Traub at any time about this light?

A    The next day when Dr. Traub came to [Bourque's] room and explained to us what was wrong with her. . . . I said, "I'm glad that that's what wrong with her, because" - - I said, "I did not know. A light fixture fell on her last night. . . .

. . . .

Q    Okay. What problem did the electrician come look at the fixture for?

A    When it fell.

Defendant's Exhibit 16 is a letter dictated by Jerry that states, "[t]he work done by Donald Lack Construction was so bad that on Aug. 10, 2002 the florescent light in the kitchen fell out and hit my wife on the right side of her head [and caused] a black eye and her right side of her forehead to swell." Jerry clarified the accident date alluded to in the letter. He testified that, unbeknownst to him, the alleged accident date was incorrect due to a typographical error made by his son, the typist of the letter. According to Jerry, the date of the letter, "Aug. 10, 2002" should have been August 19, 2002. Jerry's testimony on this issue is as follows:

Q    You say the accident didn't occur on August 10, 2002.

A    No, it did not.

Q    It didn't occur closer to October 1, 2002.

A    No it did not.

. . . .

9

Q      Did it occur at all?

A      Yes, it occurred.

Ronald Lynn Smith, who was present the night of the alleged accident and is of no relation to Bourque, testified via deposition to the following:

Q      Where were you when the accident happened, physically, when it happened?

A      Sitting on the couch in [the] living room.

Q      And who else was in the living room with you?

A      Jerry.

Q      "Jerry." Okay. Where was [Bourque]?

A      She was in the kitchen.

Q      Could you see her from where you were on the couch?

A      No. Could not see her. I could see her when I came in the door, but I couldn't see her after I sat down on the couch.

Q      When you first walked in the house, what was [Bourque] doing?

A      She was ironing.

Q      And she was doing that in the kitchen?
A      Right.

Q      How did you know something happened?

A      Well, first of all, I hear her holler, and I heard a big bang.

       . . . .

Q      Okay. What did you do?

A      We got up and ran in there.

Q      When you say "in there," you mean in the kitchen?

A      Right

Q      What did you see when you got in the kitchen?

A       I seen [sic] her on the floor, basically, um, her head and back, against the cabinets. And she was kind of sitting on the floor, leaning back against the cabinets like that (demonstrating).

. . . .

Q       Was she unconscious?

A       I presume she was unconscious. I mean, I don't - - I'm not a doctor. I can't tell you she was unconscious, but she was out of it.

. . . .

Q       All right. What else did you observe in the kitchen?

A       The light from the ceiling had came [sic] off the ceiling.

Q       Okay. And what was its condition when you first walked in the kitchen? What was the condition of the light? What did you see?

A       Well, the light was hanging by - - looked like some maybe Romex wire. I mean, I didn't look at it close, but that's what it looked like to me, handing from some Romex wire.

Nicky Priola, president of Priola Construction, was Bourque's employer at the time of the alleged accident. He testified to the following:

Q       Did [Bourque] ever tell you anything that was not true?

A       No.

Q       When she told you something did you believe her?

A       Yes.

. . . .

Q       Okay. Were you in and around the office where you could observe and see what kind of problems [Bourque] may have or anything unusual about [her] when she came back to work?

A       Yes.

Q       And tell us what things you noticed about her. Was she still able to do the work she was doing before when she came back from the injury?

A       No.

11

Q    Tell the jury what you observed.  What happened to her condition?  Did she get better after a while, or did she get worse, or what was her situation?

A    When she came to work she has some slight bruises on her face.  She looked like she was in some pain.  I asked her what happened and she said that a light fixture fell on her.  But she was noticeably hurting.

All four of these testimonies corroborate one another.  Thus, in the record before us, we have three different testimonies that an accident occurred on August 19, 2002, and we have Bourque's employer testifying to Bourque's reputation for veracity and to seeing evidence of the accident on Bourque face.  Further, there are exhibits in the record of pictures taken by Jerry dated August 20, 2002, that depict the fixture the day after it allegedly fell.  Those pictures show the spring-loaded toggle bolt wings, in an open position, still attached to the threaded bolts.

The only evidence in the record that tends to show that no accident occurred is the fact that neither Bourque nor Jerry told the hospital staff about the fixture hitting her when she went to the emergency room on August 19, 2002.  Bourque responded to questions about her failure to report the accident by stating that she did not think the swelling of her mouth, the reason for her emergency room visit on August 19, 2002, was related the fixture hitting her because the swelling occurred on a different area of her head than where it struck her.

Dr. David Dietz, as well as every other physician that testified in this case, was questioned about no mention of the fixture hitting Bourque when she went to the emergency room that night for angioedema.  While some physicians found it odd when questioned by Lack's counsel, most responded that they understood its absence due to Bourque's appearance in the emergency room for angioedema rather than orthopedic injuries when informed of this fact by Bourque's counsel.

12

Dr. Dietz was especially insightful on this issue when he was questioned by Lack's counsel. His testimony on this issue follows:

> Q    [T]here's nothing about any orthopedic or neurological complaints in [the August 19, 2002 emergency room] records, are there?
>
> A    Well, not complaints. I think your - - to be fair for the jury - - when someone comes to the emergency room, especially with the potential of angioedema, angioedema is a rapid onset of abnormal swelling usually of the face, could be of the hands. I have personal experience with angioedema, and quite frankly it scared the living hell out of me. At that moment in time that's considering a potential serious event and you may not spend a half an hour to go into an extensive past medical history, quite frankly.
>      And the way this is check marked and minimally documented explains they did their job. They were presented with an acute event, they addressed the acute event and did not document a whole lot else.

Given this testimony, the testimonies above, and the numerous positive references from disinterested parties in the record to Bourque's character, we find that Bourque has carried her burden of proof on this issue. A contrary finding would require this court to determine that three witnesses collaborated on the creation of a story that the fixture fell and hit Bourque. In furtherance of this creation, this court would also have to find that Bourque staged the pictures in the record after having unscrewed the threaded bolts and retrieving the spring-loaded wings in the attic despite Lack's testimony he did not check in that attic to see if the toggle bolts had been properly installed because he had recently sprayed a thick layer of insulation on top of the sheetrock ceiling. Finally, to give credence to Lack's postulation, we would have to find that Bourque lied not only to Priola about the origins of facial bruises that Priola observed two days after the accident, but also to each and every physician that treated her over a nearly ten-year period. This court cannot do so. At least one, and arguably two of the three persons present when the fixture fell are not interested parties to this litigation and have no

13

incentive to concoct such a tale. Moreover, the overwhelming weight of the evidence in the record is that Bourque is an honest individual, and there is no evidence in the record that any of the other witnesses that corroborated Bourque's testimony are not truthful. As such, we find that an accident occurred on August 19, 2002, wherein the fixture fell and struck Bourque on the right side of her head and knocked her unconscious. Further, we find that the pictures taken by Jerry on the day after the accident are not staged in any fashion.

*Prerequisite Fact Finding – How did Donald Lack install the fixture?*

Given these findings, we must now make the second finding of fact as to how Lack's actually installed the kitchen light. This is a prerequisite to any duty/risk analysis, as, clearly, we must determine Lack's conduct, through its employee, Donald Lack, prior to subjecting that conduct to the analysis annunciated in *Roberts*.

Donald Lack is a carpenter and employee of Lack who installed the kitchen light fixture. What parts were used to install the fixture are not in dispute. A toggle bolt[2] was used on each side of the fixture to attach it to the ceiling. Further, it is not in dispute that neither a Romex[3] wiring connector[4] nor Romex wiring staples[5] were used in wiring the light. However, there exists a disputed fact as to how he installed the toggle bolts. Donald Lack first testified regarding the installation of the fixture during Bourque's presentation of evidence. In that

---

[2] For an explanation of the parts to a toggle bolt and how one is properly installed, please see Footnote One located in the facts of this opinion.

[3] Romex is a type of wire that consists of two conductor wires and a ground wire. Each wire is individually insulated in plastic. All three wires are then encapsulated in an additional outer sheath of moisture resistant, non-conductive material, also usually plastic.

[4] A Romex connector is used by electricians in a junction box to prevent the Romex wiring from having its sheaths removed by friction that can occur when the Romex wiring is rubbed against the hole in which it enters or leaves the junction box.

[5] Romex staples are used to attach Romex wiring to non-conductive material, usually wood, so as to prevent the Romex wiring from hanging which encourages improper usage such as hanging items from the wiring.

14

testimony, he contended that he had help in installing the fixture in the person of Danny Moore.

Donald Lack testified during Lack's presentation of evidence as to how they installed the light fixture, to the following:

Q    You arrived to hang the light up.  Tell me, first, how do you select the method by which you're going to attach it to the ceiling; how'd you make that decision?

A    It was – we normally use the toggle bolts to put it up.  We drill it, and if you don't – if you just hit air, then we use the toggle bolt.

. . . .

Q    How do you decide which [drill] bit you're going to use to drill a hole for a toggle bolt?

A    I usually carry a little template with me, I take the toggle bolt, close the wings up, the template's got a bunch of holes in it.  Just go through the holes until you get the one that the toggle bolt fits properly.  And then from there you take that hole, get your drill bits, and just start matching drill bits until you hit that hole.

Thereafter, Donald Lack gave a lengthy, detailed description of how to find where to mark the ceiling and, eventually, drill the holes.  Following this description, he testified:

Q    What do you do next; do you drill the holes next; do you stop and fool with the fixture; what do you do next?

A    Well, the next thing we do is normally we drill the holes.

Q    And [in installing the Bourque's kitchen fixture,] who drilled which hole first?

A    I drilled the hole on the left first.

Q    On the left.  Now, this jury understands that there's a hole that got through Sheetrock without a problem, and a hole that hit a piece of wood.  Which hole was yours?

A    My hole was the one that went through the Sheetrock.

Q    Was there any problem with drilling the hole in your side?

15

A No.

  . . . .

Q What happened with the hole on Danny's side?

A When he drilled it? He said that he hit wood, and stopped.

  . . . .

Q Okay. Now, what did you decide to do about [Danny's] hole in that side?

A That's when we decided to use a lag screw.

Q Tell the jury what a lag screw is.

A It's basically a wood screw but it's got a hex head on the end of it, instead of like a Phillips' or – and it's made, designed to go into wood. It's just a little better holding.

Q Did you drive a pilot hole for that screw?

A No.

Q Did you need to do that?

A No.

  . . . .

Q What did you do next to hang the fixture?

A Danny was on the ladder, so I gave him one end. And then I would have taken my end first, close the wings. Held it; run through it. Run it all the way up. You could hear it open. You can feel it. It actually vibrates the bolt when [the set of wings open]. . . .

  . . . .

Q I think it's correct you said, you can hear and feel the toggle [wings] open?

A Correct.

Q At that point are you sure the toggle is above the other side of the Sheetrock?

A Without a doubt.

16

Q    You talked about tightening and you tightened it up a little bit but not all the way, correct?

A    Correct.

Q    And then Danny went to put his screw in?

A    Correct.

Q    And what happened on that end?

A    When he screwed his in, the lag screw, it just spun, it didn't hold, and that's what he said, he said, it's not holding.

Q    And Danny was doing this work, not you?

A    Correct.

. . . .

Q    Okay.  So what did y'all decide to do instead?

A    We went to a toggle bolt on his side.

. . . .

Q    Did I ask you what drill bit did Danny use to –

A    The same drill bit I did.

. . . .

Q    [Did] you see Danny drill the hole.

A    Yes.

Q    And what happens?

A    He [] drilled with no problem.

Q    Did he say anything?

A    He said it felt like it went beside the ceiling joist.

Q    So what happens next?  I think you mentioned he goes and get a toggle [bolt]?

A    Yeah, he went and got a toggle bolt, actually a longer toggle bolt, while I [sat] there and held the light.

17

Q      And then what happened after that?

A      He came back in; I held the light while he took his bolt apart and assembled it like I did for this one here. . . .

. . . .

Q      Okay.  Did you see him insert the toggle in the ceiling?

A      Yes.

Q      Did you hear the toggle [wings] open up?

A      Yes.

. . . .

Q      Any question in your mind that the toggle [wings], in fact, opened up above the wood or scab in the attic?

A      No.

Donald Lack then testifies that after tightening the threaded bolts of the toggle bolts, the fixture is snug to the ceiling.  Thereafter, the following exchange took place:

Q      What was done to ensure that the fixture was firmly connected to the ceiling at this point?

A      You grab it and shake it.

Q      And when – did you do that yourself?

A      Yes.

Q      When you did that, did the fixture come loose?

A      No.

Q      Did the fixture move around?

A      No.

Next, Donald Lack testified that he connected the wires from the attic to the light, placed the cover around the ballast of the light, inserted the bulbs in the light, and, finally, attached the lens cover to the light.  His testimony regarding each of

18

these actions was coupled with an assertion that the fixture did not fall or show signs of being loose.

In summation, Donald Lack testified to his certainty of hearing and feeling the spring-loaded wings of the toggle bolt snap open above the sheetrock on his side of the installation. He also claims to have heard the wings of the toggle bolt snap open when Danny Moore installed the toggle bolt on the other side. This testimony is not supported by the photographic evidence, nor is it supported by the expert testimony when coupled with our rejection of Lack's postulation of a staged accident.

The pictures taken by Jerry the day after the light fell depict round holes in the ceiling where the toggle bolts had been installed. Logic dictates, and all expert testimony in this case agrees, that barring the spring-loaded wings being unscrewed from the threaded bolts of the toggle bolts, if the toggle bolt wings had snapped into place as Donald Lack testified, the two holes depicted could not exist in this condition. Rather, the toggle bolt wings, if snapped into position, would have made much larger and jagged holes when they passed through the sheetrock as the fixture fell.

Above, we rebuked the possibility of the toggle bolts being unscrewed to stage an accident. However, another factor that this court must consider in making its finding of how Donald Lack actually installed the toggle bolts is that the fixture remained in place for approximately five months prior to the accident. Jerry testified that on one occasion during that five month span he adjusted the bulbs in a successful effort to alleviate an illumination problem with the fixture. He described the force he exerted on the fixture as minimal when responding to questions about the bulb adjustment. Further, Bourque presented experts who opined that the fixture could have stayed in position for that time, regardless of

bulb adjustment, if the spring-loaded wings of the toggle bolts were jammed into the sheetrock on one side while being jammed into both sheetrock and wood on the other.

A final consideration is Donald Lack's testimony that he heard and felt the spring-loaded wings of the toggle bolts snap into place and that he performed a "grab and shake" test on the light to which it passed. While this testimony is uncontested, it is not corroborated. The only person who could have done so, Danny Moore, does not remember installing the fixture. Further, Donald Lack has a vested interest in making this assertion.

Therefore, we find as fact that Donald Lack did not install the toggle bolts to where the spring-loaded wings snapped into position above the sheetrock ceiling as it is the only plausible explanation given the evidence in the record. Defendant's Exhibit 12 depicts the spring-loaded wings as still attached to the threaded bolts of the toggle bolts once the fixture fell. Those spring-loaded wings, when no longer jammed into the drilled holes, functioned correctly, as they were engaged. Additionally, we have testimony from Donald Lack that he did not check in the attic to see if the spring-loaded wings of the toggle bolts had engaged because of a new layer of insulation that he laid prior to installing the fixture. Finally, it is not in dispute that Donald Lack did not use a Romex connector or Romex staples to secure the wire of the light. As such, we will subject Donald Lack's conduct to the duty/risk analysis of *Roberts*.

*Duty/Risk Analysis – Part I:*

It is undisputed that pinching the spring-loaded wings of toggle bolts and jamming them into drilled holes was a cause-in-fact of the fixture falling and the injuries, if any, that Bourque suffered as a result. Additionally, it is not in dispute that the fixture would not have struck Bourque had Donald Lack used a Romex

connector or Romex staples within twelve inches of the fixture. Thus, the installation of each toggle bolt and the failure to use a Romex connector or Romex staples to fasten the wire to a ceiling joist within twelve inches of the fixture are all substantial factors in bringing about the harm to Bourque.

*Duty/Risk Analysis – Part II:*

Next, we must determine if Lack owed a duty to Bourque. Lack, as the employer of both Donald Lack and Danny Moore, is responsible for their acts. La.Civ.Code.art. 2320. Contractors are bound to warrant their work and are responsible for damages stemming from defective installation. La.Civ.Code art. 2769. Accordingly, Lack, as contractor, has a duty to Bourque to provide proper workmanship or installation.

*Duty/Risk Analysis – Part III:*

Having found that Lack's acts, through its employees, were a cause-in-fact of any injuries that Bourque sustained from the fixture falling and that Lack owed a duty to Bourque, we must now determine whether that duty was breached. All testimony, expert and otherwise, agrees that jamming the pinched wings of a toggle bolt into drilled holes is not proper technique for the use of toggle bolts to hang the kitchen fixture. Thus, Lack, through Donald Lack and/or Danny Moore, breached its duty to Bourque by using this improper installation method.

The parties dispute whether the use of a Romex connector and Romex staples was required by the National Electrical Code (NEC) on a residential property in Calcasieu Parish in 2002, and whether Donald Lack's failure to use them was a breach of Lack's duty to Bourque. Donald Lack testified that the use of these items was not his responsibility, as they are usually installed by an electrician during the "rough-in" stage of wiring a home. Discussion of the failure to use these two items and whether Lack's duty to Bourque was breached in failing

21

to use them is not necessary due to our finding just below that the protection afforded by the duty to use them is not encompassed by the scope of that duty.

*Duty/Risk Analysis – Part IV:*

This court, in *Nicholson v. Calcasieu Parish Police Jury*, 96-314, p. 6 (La.App. 3 Cir. 12/11/96), 685 So.2d 507, 511, discussed the inquiry necessary in analyzing legal cause wherein we stated:

> The scope of protection (legal cause) inquiry is a question of policy whether the particular risk falls within the scope of the duty. See *Faucheaux*, 615 So.2d at 292. The duty-risk analysis is "highly fact-intensive" and the legal cause inquiry "fact bound." *Roberts*, 605 So.2d at 1055. *Faucheaux*, supra, summarizes the test for legal cause:

> > The scope of protection inquiry asks whether the enunciated rule extends to or is intended to protect this plaintiff from this type of harm arising in this manner.... In determining the limitation to be placed on liability for defendant's substandard conduct, the proper inquiry is often how easily the risk of injury to plaintiff can be associated with the duty sought to be enforced.

In the case before us, all expert testimony in the record is that the purpose of a Romex connector is to protect the wires from having their protective sheaths removed due to scraping against the edge of a junction box. Therefore, the scope of the protection afforded by one's duty to use a Romex connector does not include the risk of the fixture falling. Rather, it includes any damage caused as a result of the Romex wire being scraped by a junction box, i.e., personal and property damage caused by an electrical fire or a shock suffered as a result of the exposed wire.

Likewise, the testimony in the record indicates that the purpose for using Romex staples to attach the Romex wiring to a ceiling joist or other structure is to prevent the wire from sagging or to prevent a person from using the wire to hang items. As such, any injury Bourque suffers from a falling fixture is also outside the scope of any duty to use Romex staples.

22

The result is different in analyzing Lack's failure to properly install the toggle bolts. All testimony in the record is uniform that the specific purpose of toggle bolts in this installation is to keep the fixture attached to the ceiling. As such, Bourque's injuries from a falling fixture directly fall within the scope of Lack's duty, which it breached, to properly install the fixture.

*Causation – Preexisting Conditions*:

Having made a determination that Lack breached its duty to Bourque and her harm as a result of that breach in encompassed in that duty, we must now look to the medical evidence in the record to find what injuries, if any, that Bourque carried her burden to prove were caused by the fixture striking her in the head. There is no dispute in the medical evidence that Bourque suffered from degenerative disc disease prior to the accident. Further, there is no dispute that Bourque underwent a back surgery for a herniated disc at the L5-S1 level on July 20, 1990. Finally, there is no dispute that Bourque intermittently suffered migraine headaches, neck pain, and back pain prior to the August 19, 2002 accident.

*Emergency Room Visit – August 19, 2002*:

According to Bourque's testimony, she felt that any injuries she sought treatment for during the emergency room visit on August 19, 2002, were more likely than not related to a reaction to her blood pressure medication, Altace, rather than to any injury caused by the fixture striking her. This was also the opinion of Dr. Kyle James, the emergency room physician that saw Bourque on August 19, 2002, and the opinion of Dr. Michael Traub, Bourque's family physician that saw her the next day. Thus, Bourque cannot recover from Lack for the medical bills incurred during that overnight hospital stay, nor any pain and suffering as a result of the angioedema, nor economic losses incurred from that stay, i.e., the day of work she missed that next day.

23

*Causation – Headaches*:

Bourque was treated for headaches by Dr. Fayez Shamieh, a neurologist. Although other physicians were questioned regarding Bourque's headaches, they all deferred to Dr. Shamieh and his findings. When questioned about Bourque's character as a patient, Dr. Shamieh testified to the following:

Q       [H]ave you ever had any problems with [Bourque]?

A       No. None whatsoever.

Q       Has she ever come to you and tried to magnify or exaggerate her symptom[s]?

A       No.

        . . . .

Q       So is there anything else you can say about [Bourque]? What do you think of her as far as being truthful, sincere, and things of that nature?

        . . . .

A       Again, in my opinion she is a legitimate person. I don't think she is malingering. If she was then, you know, I can bet all my experience on it for 35 years. I think she's legitimate in my opinion.

Dr. Shamieh was also asked about Bourque's headaches that she suffered prior to the August 19, 2002 accident. On this issue, he testified:

Q       [D]id you elicit from [Bourque] any prior history of headaches? Did you ask her or did she volunteer that she had had prior history of headaches?

A       My understanding that the type of headaches she was having when she presented to me, did not have it before.

Q       Yeah. The headaches that she presented to you what type and how severe were they?

A       She presented with the severe type of headache, and described it as a sharp pain, at times it was dull-aching type of pain. And she never had this type of headache before.

        . . . .

24

Q    And you would call the past headaches occasional headaches?

A    That's right.

Q    And now she has constant headaches?

A    Yes.

Q    And the severity of the headaches are they much more severe now than those that she may have described or those that may be been depicted on anything from Dr. Traub and so on?

A    That's right, yes.

Dr. Shamieh, when questioned regarding the cause of Bourque's headaches after the accident, testified to the following:

Q    In your opinion were those trauma-related headaches that you saw that [Bourque] had?

A    Most likely it is trauma related.

     . . . .

Q    Do you feel that the treatment you gave [Bourque] was both reasonable and necessary?

A    Yes.

Q    And do you feel that it was causally related to the injuries she sustained on 8/29/02 in the light falling incident?

A    That's correct.

Lack's counsel then questioned Dr. Shamieh. In that questioning, counsel showed Dr. Shamieh various medical records indicating that Bourque had suffered headaches prior to the accident. Thereafter, on redirect examination, Dr. Shamieh testified to the following:

Q    [These documents] confirmed rather than changes your mind, doesn't it, that [Bourque] was having infrequent headaches?

A    Yeah. It doesn't change my mind.

Q    You are of the single opinion that she has severe and constant headaches, are you not?

25

A      Yes.

Q      They are traumatically induced?

A      Most likely it's trauma induced.

Given the testimony above, we find that Bourque has carried her burden to prove that the severe and constant headaches she suffers are causally related to the August 19, 2002 accident.  We base this finding on Dr. Shamieh's endorsement of Bourque's character, on Bourque's testimony that differentiates the preexisting headaches from the post-accident headaches, and Dr. Shamieh's finding that those post-accident headaches are more probably than not related to the light falling and striking Bourque.

*Causation – Neck Pain and Surgery:*

Several physicians relayed opinions regarding Bourque's neck pain.  They were Drs. Shamieh, Jeffrey Kozak, Michael McCann, and Robert Bernauer.  Dr. Shamieh related Bourque's neck pain, along with the headaches, to the accident.

Dr. Jeffrey Kozak, an orthopedic surgeon, saw Bourque regarding her neck pain.  Lack points out that Dr. Kozak noted, on one visit, that Bourque showed signs of malingering.  While this is accurate, Dr. Kozak testified that in his opinion the one instance malingering that occurred on one test was most likely due to Bourque's depression from marital problems and, thus, not from motivation of secondary gain.  Further, Dr. Kozak, once being informed that Bourque requested to return to work just two weeks after her neck surgery, testified to the following regarding his impression of Bourque and the causation of her neck and lower back pain:

A      Patients who seek early work return are motivated people and want to get well.

26

Q    Doctor, you've had her as a patient since 1990.  And she has been a fairly good patient?

A    Yes. Very good.

Q    And [the one instance of symptom magnification] was the first time you've seen anything that you felt was - - would be questionable in your mind in that area?

A    Yes.   You know, there was the probable depression and symptom magnification that occurred on one visit, which was the last visit, was the only issue.  And I wouldn't even call that a problem for me.  It's a problem for her.


Q    The signification or severity of the depression certainly could play a significant role in the bad examination of breakaway weakness.

A    Definitely.

Q    Doctor, let me ask you this.  You saw her since 1990.  It's been five or six years form the last time you saw her before this accident until you saw her after this accident.
          Based on reasonable medical probability do you feel that the conditions you were treating [Bourque] for were related to the accident of 8-19-02, when the light fell on her, especially since she had the tear in her shoulders and everything else from the severe fall as well as to her neck?

A    I think from the information that's been provided that there was an aggravation of previously existing multi-level cervical and lumbar degenerative disk [sic] disease.

Dr. Michael McCann, whose primary scope of practice dealt with interventional spinal care, worked with Dr. Kozak treating Bourque both prior to and after the accident.  He testified that he injected Bourque's neck in 1997 and that she had 100% relief as a result of those injections.  Further, Dr. McCann testified regarding his impression of Bourque and the causation of her neck pain subsequent to the accident as follows:

Q    At any time - - I want you to think about this - - at any time during the many, many times that you talked to [Bourque] and she would give the complaint and you would finally try to find out what the real problem was, did she ever try to mislead you at any time?

27

A    No, absolutely not.

Q    Did she ever try to exaggerate problems that were nonexistent at any time during the entire time you worked with her for Dr. Kozak and yourself?

A    No.

. . . .

Q    Did [Bourque] have chronic pain?

A    Do I?

Q    Did she have? [Bourque]

A    Yes.

Q    And it is something in your opinion she's going to have to live with for the rest of her live?

A    Yes.

Q    And the medical probabilities what are they?  Is it probably that her condition is gonna [sic] get better as she grows older, or is it gonna [sic] get worse?

A    99.99 percent change it's gonna [sic] progressively get worse.

. . . .

Q    Assuming the history to be correct as to the light falling and based on reasonable medical probability, do you feel that the treatment that you rendered to her was both reasonable and necessary and causally related to the accident?
     . . . .

A    Yes.

Finally, Dr. Robert Dale Bernauer, an orthopedic surgeon, performed surgery on Bourque's neck on February 18, 2003.  His testimony regarding his treatment of Bourque is as follows:

Q    Now, to get an idea as to what type of person you were dealing with, would you look in your records and tell me whether or not [Bourque] requested that you allow her to return to work at least light duty?

28

A   Yes.   She called the office on March 11, 2003 requesting a work release for light duty, three to four hours a day.

Q   Okay.   What does that tell you, doctor, when you've done a fairly major surgery such as you did, and someone clls you about 13 or 14 days later and asks to be able to go back to work? What does that tell you about that person?

A   Tells me that they're very stoic and very . . . motivated to go back to work, to get back to their job.

       . . . .

Q   Doctor, during you entire time you saw this little lady there were numerous problems she had and every time that there was a complaint when you did either the examination or the testing, what did it reveal relative to her complaints?

A   She - - all the test we did showed a problem where she was complaining.
       . . . .

Q   Did she ever exaggerate to you or did she every [sic] complain something that you tested and found there was nothing there?

A   No sir.

       . . . .

Q   Okay.  Was she a believable person?  Tell the jury in your own words what your impression of her was.  Because you had some period of time you related to her.

A   Well, she was very straightforward and accepted all the testings that we felt was [sic] necessary, and sought the help that she needed and was always trying to go back to work.  And as I said, went back to work less than a month after neck surgery, which is probably the only patient I've ever had that's done that.

       . . . .

Q   [B]ased on reasonable medical probabilities, and assuming that history to be accurate, do you feel that the neck problem that you saw her for was causally related to the accident she had?

A   Yes.

       . . . .

Q   Have you seen anything at all in this case, and has anyone furnished you anything to back up any claims by the defense

29

that this lady is trying to fake and try to puff up and try to fake a claim?

A    No.

Q    You have seen a lot of people that were exaggerating; have you not?

A    Yes, I have.

Q    Did you find any exaggeration on her?

A    No.

The summation of these testimonies is that Bourque was an honest patient despite one incident of failing to perform to her best on one office visit to Dr. Kozak. Further, while Bourque had preexisting degenerative disc disease in her cervical discs, it is clear from the testimony above this condition, just prior to the accident, was asymptomatic. Finally, it is the unanimous opinion of the physicians that treated her that this accident caused her neck pain and caused her to have to undergo surgery. Therefore, after reviewing the evidence in the record, we find that Bourque has carried her burden to prove that the neck pain and surgery was causally related to the August 19, 2002 accident.

*Causation – Low Back Pain and Surgeries:*

As seen above, Drs. Bernauer, Kozak, and McCann testified that all of their treatment of Bourque, including her low back pain and subsequent surgeries, were related to the accident. Dr. Bernauer performed low back surgery on Bourque on October 8, 2003. Thereafter, Bourque continued to suffer from low back pain, but Drs. Bernauer, Kozak, and McCann told Bourque that there was nothing more, surgically, they could do to help with the back pain. Bourque sought another opinion from Dr. Donald Dietz, a neurosurgeon. He has seen Bourque on December 31, 2002, to give a second opinion that Bourque was a good surgical candidate for the neck surgery eventually performed by Dr. Bernauer in February

of 2003. Dr. Dietz, on September 23, 2008, performed a lower back surgery on Bourque using a technique that was not available to Bourque after her October 8, 2003 low back surgery. An excerpt of his testimony follows:

Q    [W]hen [Bourque] told you she was hurting was it borne out by the subsequent testing?

A    Correct. From 2000 (sic) all the way to 2010 we still have seen her, as recently as August. She's always seemed to be consistent, forthright, honest and sincere. Her complaints always have correlated with some abnormality.

    She has been realistic and seems to understand and comprehend what we say. She listens well. Comes back and asks questions. Stoic, I think that's a tough one, that's an individual thing.

    But, certainly, obviously she tolerated her pain. It took her two years form the time she was told nothing else can help, and someone offers something, to make the decision to do something. So she - - is that stoic? I guess you could say yes. Is that realistic? I guess you could say yes there, too.

    But she certainly - - I have no reason to doubt anything that she has told me to this point.

Additionally, Dr. Dietz was questioned about Bourque's preexisting degenerative disc disease by Lack's counsel and how it may have caused the pain she suffered in the neck and low back. Thereafter, on redirect examination, the following exchange transpired:

Q    They asked about preexisting degenerative disease. Can trauma aggravate and make symptomatic a degenerative condition?

A    Correct. And other counsel agreed to that or stated that also. I will take this opportunity to state that, yes, degenerative disk [sic] disease can cause problems without trauma. No doubt about it. I guess the question when someone has a trauma that one must ask is it more likely that the degenerative disk [sic] disease spontaneously became active within a reasonable timeframe around that trauma, or is it more likely that trauma actually initiated or aggravated degenerative disk [sic] disease.

    In general, it's reasonable to think that trauma did. In this case we would have to assume that the neck and low back degenerative disk [sic] disease decided to act up simultaneously spontaneously, if we're gonna [sic] accept a nontraumatic causation.

So it makes it a little easier on us, probabilities start to favor that the trauma is more likely to cause as long as there's proof of that trauma.

Finally, on redirect examination, when he was again directly questioned about causation, Dr. Dietz testified:

Q    You gave us an opinion that in your opinion, expert opinion, that the conditions you saw her for and the things that she was treated for, the surgeries she had were causally related from the light incident of August 19, 2002. Correct?

A    Correct.

Q    The defendant has the opportunity, they strenuously cross examined you, have they changed your opinion or is it still your opinion that the injuries and so on were causally related to this light?

A    That is still my opinion.

Given the medical testimony in the record, we find that the fixture striking Bourque was a legal cause of her low back pain and all associated medical treatment she received for that pain. This includes, but is not limited to, the October 8, 2003 surgery and the September 23, 2008 surgery.

*Causation – Shoulder Pain and Surgery:*

Bourque was treated for right shoulder pain by Dr. Gary Gartzman, an orthopedic surgeon who specializes in shoulder surgery. Dr. Gartzman had no independent recollection of Bourque's personality as a patient, however, he performed surgery on Bourque' right shoulder on April 25, 2003. He testified to the following regarding causation:

Q    First of all, when you have a torn rotator cuff and the tendon torn and so on, can that be caused or can that be related to trauma?

A    Yes.

Q    Okay. [Bourque] gave you a history of this light falling on her, did she not?

A    Yes.

32

Q      Did anyone ever indicate to you that she was hurting the day before the light, having shoulder problems or anything else before?

A      No.

Q      Okay.  Based on reasonable medical probabilities and assuming the history to be accurate, would you say in your expert opinion that the condition you found the torn rotator cuff impingement syndrome were probably related to this accident with the light?

A      Yes.

Q      Okay.  Would you say that the care and treatment that you prescribed for her was reasonable considering the type of injury she had?

A      Yes.

Lack has not provided any testimony to contradict Dr. Gartzman's opinion.

Therefore, given this testimony, we find that Bourque's shoulder pain and surgery

were casually related to the August 19, 2002 accident.

*Damages – Medical Bills:*

Bourque has submitted, through Plaintiff's Exhibit 23, a list of all medical

bills incurred.  Bourque has carried her burden to prove that she is entitled to any

and all medical bills with the exception of any which were incurred due to the

emergency room visit on August 19, 2002.  We reach this conclusion based on the

medical testimony in the record.  Accordingly, we render judgment, finding that

Bourque is entitled an award of past medical bills in the amount of $452,689.78.

*Causation and Damages – Economic:*

Dr. Dietz was the only physician to testify regarding whether Bourque could

work.  His testimony on this question is as follows:

Q      Is it your opinion as you sit here today that [Bourque] cannot engage in any form of gainful employment?

A      I don't think she can without undue suffering.

Accordingly, we find that Bourque is entitled to economic damages resulting from her inability to work. We will next address what those damages entail.

Dr. Charles Bettinger, an economist who testified on behalf of Bourque, opined that Bourque suffered an economic loss of $537,807.00. Jonathan Stuart Woods, an economist who testified on behalf of Lack, opined that Bourque suffered an economic loss of $121,061.20 on the low end, $138,043.74 on the high end, with a midrange loss of $129,552.47. Both economists' findings included consideration of the cost of future medical expenses, loss of income endured prior to the trial, and loss of future income. The main differences in the numbers they reached in their opinions stemmed from how long each calculated Bourque expected to work and what fringe benefits Bourque would have received had she continued to work for Priola Construction. Dr. Bettinger used seventy years of age as his cutoff for when Bourque would work based solely on Bourque's stated intentions. Stuart based his calculations of Bourque's work age expectancy given her applicable demographics. Additionally, Dr. Bettinger took into consideration various benefits that Bourque received at Priola Construction, while Stuart did not.

After considering both experts' opinions and testimony, we render that Bourque is entitled to a total award of $250,000.00. This amount includes Bourque's recovery for loss of wages and benefits, both past and future, and for future medical costs.

*Damages – Pain and Suffering/Loss of Enjoyment of Life:*

The treating physicians consistently and universally testified that Bourque is a truthful, excellent patient whose complaints corresponded to objective medical findings. Further, those physicians opined that the objective medical findings were all caused by the August 19, 2002 accident. These testimonies are not controverted by any testimony in the record.

However, Bourque has a medical history of intermittent migraine headaches, intermittent neck pain, intermittent low back pain, and a prior low back surgery. Further, Bourque also had preexisting degenerative disc disease.

We note that, under Louisiana law, Bourque is entitled to compensation for aggravation of her preexisting conditions while no compensation can be made for the existence of those preexisting conditions. This distinction, while subtle, is significant, and we have taken it into account rendering judgment in this case. While those preexisting conditions were present, Bourque was engaging in a relatively normal life prior to this accident. The record is voluminous and clearly indicates that this lady has suffered and will continue to suffer greatly. She has undergone four surgical procedures, and her potential for enjoyment of life is greatly diminished. Accordingly, after a thorough review of the record, we render judgment, finding that Bourque is entitled to a total of $500,000.00 for the aggravation of her preexisting medical conditions and the loss of enjoyment of her life, both past and future.

## ASSIGNMENTS OF ERROR BOURQUE:

Bourque, in her first assignment of error, alleges that the trial court erred in allowing defense expert, J.P. "Sonny" Launey to testify. Secondly, Bourque asserts that the trial court erred in denying plaintiff's *Daubert* Motion relative to the testimony of defense expert, J.P. Launey

In both assignments of error, Bourque's requested relief was that this court perform a de novo review of the record without giving any consideration to Launey's expert opinion. We find no error by the trial court in allowing Launey's opinion into evidence. Above, we conducted a de novo review of the record based on the impossibility of determining the jury's intent from the compound jury interrogatory and negative response. We note that when this court did the de novo

review, we took into consideration Launey's report because these assignments of error lacked merit.

Finally, in her third assignment of error, Bourque intimates that the jury erred in failing to find Lack at fault. Our de novo review of the record addressed this issue. Thus, this assignment of error is pretermitted.

**ASSIGNMENT OF ERROR LACK:**

Lack, in its sole assignment of error, contends that the trial judge improperly granted Bourque's request for new trial after the matter was initially tried in June/July 2010. The compound jury interrogatory and negative response by the jury occurred in the first trial as well as the second. We found above that this verdict was invalid, as it is impossible for this court to determine what findings of fact, if any, the jury reached. Accordingly, this assignment of error is without merit.

**CONCLUSION:**

Both parties, Lack Construction and Patricia Bourque, raised assignments of error. Prior to addressing these assignments, this court found it impossible to ascertain the jury's intent with its verdict given the compound interrogatory and negative response. As such, we vacated the jury's verdict.

Next, given that the record was complete, we conducted a de novo review to adjudicate this matter. We found that Patricia Bourque carried her burden to prove that an accident occurred on August 19, 2002, that Donald Lack improperly installed the kitchen light fixture, and that she suffered damages as a result of that improper installation. We rendered judgment that awarded Patricia Bourque $452,689.78 in medical expenses, $250,000.00 in lost wages and future medical expenses, and $500,000.00 in pain and suffering and loss of enjoyment of life. All

36

costs of these proceedings are assessed to Lack Construction, Inc. and Essex Insurance Company.

**JURY VERDICT VACATED AND JUDGMENT RENDERED.**

PATRICIA BOURQUE

VERSUS

ESSEX INSURANCE CO.

**Cooks, J. Concurs.**

Although I join the majority in concluding *a de novo* review is warranted in this case, I write separately to further express that I also find the jury's negative response, even if applicable to the accident and cause questions, was manifestly erroneous on both issues considering the evidence presented in the record.

NUMBER 11-587

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA


PATRICIA BOURQUE

VERSUS

ESSEX INSURANCE CO., ET AL.


AMY, J., dissenting.

I respectfully dissent from the majority decision. In short, I disagree that the construction of the verdict interrogatory prevents this court from divining the jury's determination. Rather, it seems to me that the interrogatory very clearly reveals that determination. Simply, the jury rejected the plaintiffs' evidence, either in whole or in part, as a jury is permitted to do within the confines of its fact finder role.

Although the parties attribute much of their argument in brief to essentially questioning whether the defendant offered reasonable evidence to establish that no accident or injury occurred, I find that those arguments distort the burden of proof and, instead, urge impermissible re-weighing of the evidence. Of course, it is the plaintiff who must bear the burden of proving his or her case. Given this burden, it is not up to the defendant to present evidence negating the existence of an injury-producing accident.

Here, the plaintiff's evidence, testimonial or otherwise, was not so compelling to require the jury to accept the plaintiff's version of the complained-of series of events. This is true of either the evidence related to the occurrence of the alleged accident or the evidence relating to causation of the injury allegedly sustained. Instead, two different juries rejected that evidence in whole or in part. Undoubtedly, the plaintiff presented evidence that she argues satisfied her burden

of proof. However, the jury simply found that evidence lacking and that determination is supported by the record.

To the extent the majority finds the construction of the jury interrogatory erroneous, I find it notable, as a predicate consideration, that the record reveals no objection to the interrogatory now in question. Rather, it was used in both trials and, in a supplemental brief to this court, the defendants assert that the interrogatory was submitted by the plaintiff. Finally, the plaintiff did not assign any purported problem with the interrogatory as error in her appellant's brief.

For these reasons, I dissent.

NUMBER 11-587

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA


PATRICIA BOURQUE

VERSUS

ESSEX INSURANCE CO., ET AL.


EZELL, J., dissenting.

I respectfully dissent for the reasons assigned by Judge Amy and for the following reasons.

In this case, there was no objection to the jury instructions at the trial level, the issue was not designated as an assignment of error or argued on appeal, and there was no plain and fundamental error in the jury instructions or in the jury's verdict.

I do not find the jury instructions to be misleading or confusing or so inadequate or incorrect as to preclude the jury from reaching a verdict based on the law and the facts.

For the Court to reverse and render a judgment in this case where none of the factors required were met, I find the majority position unsustainable.

For these reasons, I dissent.